OPINION
{¶ 1} Joseph Padgett appeals from his conviction of menacing in the Dayton Municipal Court.
 {¶ 2} Padgett's conviction resulted from a dispute he was apparently having with his neighbor, Thomas Eskew. In the early evening hours of July 6, 2002, Eskew called police because he believed a fight was about to break out between one of Padgett's children and some neighborhood kids. Eskew testified at the trial that Padgett's wife became agitated that he had called the police to her home. Eskew said Padgett returned home a few hours later and approached him as he was taking trash out to his trash can.
 {¶ 3} Eskew then testified as follows:
 {¶ 4} "A. I was taking some trash out to my trash can and this motorcycle comes up on my front drive and says, `Hey, Tom.' So I didn't know who it was at first. So I started walking down my driveway and the motorcycle went over to his front driveway and he got off and started walking across his front yard.
 {¶ 5} "Q. Could you tell who it was at this point?
 {¶ 6} "A. Well, I figured the dad.
 {¶ 7} "Q. Who was who?
 {¶ 8} "A. Joe Padgett.
 {¶ 9} "Q. Okay.
 {¶ 10} "A. As he started walking across the front of the yard, I heard, `Hey Tom, I heard that you put your ten cents in this afternoon.'
 {¶ 11} "Q. What was he referring to?
 {¶ 12} "A. I was assuming what I was telling his mom and calling the police.
 {¶ 13} "Q. About the earlier incident?
 {¶ 14} "A. About the earlier incident.
 {¶ 15} "Q. Okay. Go ahead.
 {¶ 16} "A. And then he started cussing at me real bad.
 {¶ 17} "Q. What was he saying? This court needs you to tell me what you remember.
 {¶ 18} "A. Keep your nose out of my f-ing business, and I'm going to kick your, you know what.
 {¶ 19} "Q. I need you to say the exact words.
 {¶ 20} "THE COURT: Say it.
 {¶ 21} "A. I'm going to kick your ass.
 {¶ 22} "MR. ROSS: Okay. What about the prior statement? You said he said, `Keep your nose out of my . . .' What?
 {¶ 23} "A. He said, `Keep your nose out of my fucking business.'
 {¶ 24} "Q. And then what did he say?
 {¶ 25} "A. He said, `You need to get your ass kicked', and he was just yelling and I was stunned and I kept on backing up because he kept on walking towards me and he finally got in my driveway and I was still backing up and he said, `You want a piece of me right now?' And he had his arms down in fists and I just turned around and went right in the house and called the police and as I was going in the house, he was calling me like, `You asshole' and stuff like that.
 {¶ 26} "Q. Okay. And when you said that, did he say, . . . You said two different statements I picked up on. First you said he said, he was going to kick your ass or threatened to kick your ass and then you said, `You need your ass kicked.' Do you remember which specifically he said?
 {¶ 27} "A. See, that was before he said, `I'm going to . . . do you want a piece of me now? You need to get your ass kicked.'
 {¶ 28} "Q. Okay. Was he making any movement while he was saying these things to you?
 {¶ 29} "A. Yes, all along this he kept on walking towards me and towards me and I kept on backing up.
 {¶ 30} "Q. How far away were you when he said these things?
 {¶ 31} "A. Close enough I could smell alcohol on him.
 {¶ 32} "Q. You could?
 {¶ 33} "A. Yes.
 {¶ 34} "Q. Okay. Can you describe the odor or was it mild, moderate or strong?
 {¶ 35} "A. It was strong. I mean beer.
 {¶ 36} "Q. About how many feet away when you could smell it, approximately?
 {¶ 37} "A. I was probably say five feet away when, that is when I turned around and went straight to my back door.
 {¶ 38} "Q. When he approached you and was walking towards you and you could smell the alcohol, were you on your own property at the time?
 {¶ 39} "A. Yes.
 {¶ 40} "Q. And he was on your property?
 {¶ 41} "A. Yes. He was in my driveway.
 {¶ 42} "Q. And he also threatened and asked you, `if you wanted a piece of him now'?
 {¶ 43} "A. Yes.
 {¶ 44} "Q. Did you make any threat or movements or gestures towards him?
 {¶ 45} "A. No, I mean, I was too scared. I just turned around and I didn't even say a word because I know that he has threatened the other two neighbors and I just don't want to get involved in it.
 {¶ 46} "Q. You took the threat of `I ought to kick your ass and do you want a piece of me' seriously?
 {¶ 47} "A. Yes.
 {¶ 48} "Q. Why is that?
 {¶ 49} "A. Just the way he was coming towards me and the way his arms and fists were and I think he would have hit me if I didn't turn around and go in the house when I did.
 {¶ 50} "Q. Why did you go in the house?
 {¶ 51} "A. Because I was scared.
 {¶ 52} "Q. What did you do when you got in the house?
 {¶ 53} "A. I called the police.
 {¶ 54} "Q. Immediately?
 {¶ 55} "A. Immediately.
 {¶ 56} "Q. And the police came out?
 {¶ 57} "A. They came out and I told the police officer my story and in the meantime my neighbor had come over and said, you know, that he overheard everything.
 {¶ 58} "Q. Who was your neighbor?
 {¶ 59} "A. Gary.
 {¶ 60} "Q. Dues?
 {¶ 61} "A. Dues."
 {¶ 62} Gary Dues testified and corroborated much of Eskew's testimony. Dues testified that he heard the defendant scream at Eskew. "If you don't keep your nose out of my business, I'm going to kick your ass." (Tr. 24). Dues further testified as follows:
 {¶ 63} "Q. Were Tom and Joseph on Tom's property?
 {¶ 64} "A. Yes, they were in his driveway.
 {¶ 65} "Q. How far apart were they standing?
 {¶ 66} "A. It started to be about five or six feet away and then Tom was backing up because he was angry and he was shaking and screaming and hollaring [sic] and that's when I seen Tom back up and walk in his house and as he walked in his house, Joseph said, `Do you want some of me now?'
 {¶ 67} "Q. Who said that?
 {¶ 68} "A. Joseph said, `Do you want some of me now?'
 {¶ 69} "Q. Was Joseph walking towards Tom when he was threatening and cussing him?
 {¶ 70} "A. Yes.
 {¶ 71} "Q. Was that when you saw Tom backing up?
 {¶ 72} "A. Yes.
 {¶ 73} "Q. Towards his own house?
 {¶ 74} "A. Yes.
 {¶ 75} "Q. And what was Joseph's tone of voice when he was saying all these things?
 {¶ 76} "A. He was very angry at the time.
 {¶ 77} "Q. Was he loud?
 {¶ 78} "A. Yes."
 {¶ 79} Padgett testified and denied that he ever threatened Eskew. He said he merely told Eskew "to stay out of his fucking business." (Tr. 58). He testified he had recent back surgery and he had no intention of engaging in a physical altercation with Eskew. (Tr. 59). Padgett denied he was intoxicated and he said he was arrested by police without getting the opportunity of telling his version of the incident. Padgett's son, Shaun, corroborated his father's trial testimony.
 {¶ 80} Padgett's appointed counsel filed an Ander's brief noting that he could find no legal basis to reverse the trial court's judgment. Padgett filed his own brief noting that he believed the trial court did not listen to all the evidence. He also noted that he clenches his fist because of a degenerative disc disease and he also noted that he never entered Eskew's driveway at any time.
 {¶ 81} Padgett was charged with menacing in violation of R.C.2903.22 in that he "knowingly caused Thomas Eskew to believe that he would cause physical harm to his person."
 {¶ 82} The Committee Comment to R.C. 2903.21 provides further clarification:
 {¶ 83} "Neither aggravated menacing nor menacing requires that the offender be able to carry out his threat or even believe himself capable of carrying it out. It is sufficient if the offender knowingly causes thevictim to believe the offender will carry his threat into execution. The rationale for this is that regardless of whether the offender is bluffing or in earnest the victim may be impelled to violence to counter what he believes to be a real threat. If the victim of a threat is not in fact intimidated, the offender's conduct would constitute attempted menacing if his purpose was to intimidate or he knew that his conduct would probably intimidate." (Emphasis ours).
 {¶ 84} The statute does not create an exception for "conditional threats" which nonetheless cause the victim to believe that the offender will carry his threat into execution. See State v. Bayer (1995),102 Ohio App.3d 172 and the cases cited therein.
 {¶ 85} The trial court chose to believe Eskew's and Dues' testimony and that testimony is sufficient to support the trial court's judgment. Both testified concerning the defendant's menacing conduct. The complainant testified that he took Padgett's threats seriously and that he was in fear that Padgett would physically harm him. That fear was not objectively unreasonable.
 {¶ 86} The trial court was not required to believe the defendant's testimony. The trial court is in the best position to assess the witness' credibility and we must defer to that credibility finding absent evidence in the record that the trial court lost its way and created a manifest injustice. State v. Thompkins (1997), 78 Ohio St.3d 380.
 {¶ 87} The judgment of the trial court is Affirmed.
WOLFF, J., and YOUNG, J., concur.