The STATE of Ohio, Appellee,

v.

CULVER, Appellant.

[Cite as *State v. Culver*, 160 Ohio App.3d 172, 2005-Ohio-1359.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 2004–CA–14.

Decided March 25, 2005.

Nick Selvaggio, Champaign County Prosecuting Attorney, and Jack W. Whitesell Jr., Assistant Prosecuting Attorney, for appellee.

Darrell L. Heckman, for appellant.

BROGAN, Presiding Judge.

{¶ 1} Kenneth Culver appeals from his conviction and sentence on charges of vehicular assault and aggravated vehicular assault. After a trial to the court, Culver was found guilty and was sentenced to three years in prison on one charge and six years on the other, with the terms running concurrently. In support of the appeal, Culver assigns the following errors:

{¶ 2} "I. The evidence was insufficient as a matter of law to establish the offense of vehicular assault, R.C. 2903.08(A)(2).

{¶ 3} "II. The evidence was insufficient as a matter of law to establish the offense of aggravated vehicular assault under R.C. 2903.08(A)(1)(a).

{¶ 4} "III. The judgment of the trial court is against the manifest weight of the evidence.

{¶ 5} "IV. The trial court erred in imposing a fine on Defendant in addition to imprisonment.

{¶ 6} "V. The trial court erred in sentencing Defendant on both vehicular assault and aggravated vehicular assault as they are allied offenses of similar import."

{¶ 7} After reviewing the record and applicable law, we find the first four assignments of error without merit. The fifth assignment of error has partial merit because the trial court improperly modified the defendant's sentence after

the sentencing hearing, when the defendant was not present. Accordingly, the sentence for vehicular assault will be vacated, and this matter will be remanded for resentencing on that charge only. In all other respects, the judgment of the trial court will be affirmed.

I

{¶ 8} This case arises from a somewhat unusual auto accident that occurred in the early morning hours of January 7, 2004. Earlier that night, the victim, Kelly Serna, was in the Little Nashville Bar in Urbana, Ohio, drinking "Seven & Seven." Between 6:00 p.m. and around midnight, Serna consumed about seven mixed drinks. Also in the bar that evening was defendant, Ken Culver, with whom Serna had not been previously acquainted. Culver's precise arrival time at the bar was disputed. The bartender recalled Culver arriving between 8:00 and 9:00 p.m. and also believed she had served him five drinks. Culver testified that he arrived around 11:00 p.m., after spending the evening working on a friend's automobile. However, he did not present any evidence, other than his own testimony, to establish this fact. Culver also claimed that he consumed just one mixed drink because the bartender had accidentally knocked over the only other drink that he had ordered.

{¶ 9} In any event, at some point, Serna invited Culver to sit with her and some other people. Late in the evening, Serna decided that she wanted to visit her boyfriend in Springfield but felt she was too intoxicated to drive. At the time, Serna was married but had a boyfriend; Culver was living with the mother of his eight-year-old daughter, but their relationship was strained. Both Serna and Culver also appear to have had problems with alcohol abuse.

{¶ 10} There is no dispute about the fact that Culver offered to give Serna a ride to Springfield and that they left the bar together. However, what happened afterward is disputed. Serna made certain statements to the police at the time of the accident but did not remember certain details when she testified, particularly about events leading up to the accident. Culver also gave police an account of events that differed from his testimony at trial. Both parties agreed that they started towards Springfield but decided to turn back. Culver seems to have been motivated by Serna's allegedly flashing her breasts when they got in his van and the hope that he would "get something" that night.

{¶ 11} Serna told police right after the accident that Culver asked her several times during the ride to show him her breasts. At first, she thought he was joking, but when he persisted, asking her to engage in sexual conduct, she asked him to take her back to her car.

{¶ 12} After Culver and Serna decided not to go to Springfield, they stopped at the Logan Lodge (also known as the Econo Lodge), where Serna's cousin, Faviola Stamper, worked. According to Culver, he and Serna were hoping that Stamper could get them a free room. However, Stamper was not working that night, and they left.

{¶ 13} At trial, Serna acknowledged going to the lodge but could not recall what was said or why she and Culver went there. She did say that while they were at the lodge, she asked to be taken back to her car because Culver was swerving and she realized they both had drunk too much to be driving. At trial, Serna did not say anything about Culver's asking to see her breasts, nor did she say that he asked her to engage in sexual conduct.

{¶ 14} Culver testified that after they left the lodge, he suggested checking out another motel on the other end of town (the Country Heart). He then drove in its direction. However, when he got onto Finch Street, Serna suggested that they go back to the bar and have some drinks. Culver told her that he was not going to get "jerked around" running all over the place and that he did not need the hassle. At that point, he reached a stop light and told Serna to get out of the van and that he was going home.

{¶ 15} The night of the accident, Serna told police that even though she had asked Culver to take her back to her car at the Little Nashville, he passed the area where her car was parked and turned in a different direction. When she asked Culver to stop the car, he refused and said she was going to stay put until he "got some." Serna became more alarmed and scared. Consequently, when Culver got to the red light at the corner of Finch and Scioto Streets, Serna opened the van door and jumped out.

{¶ 16} Serna's testimony at trial was somewhat different but mostly consistent with the above account. She testified that when they came to the red light, she wanted to leave the van. She intended to walk back to her. car. Consequently, she opened the van door and put one foot on the street. She then felt the van jolt, and she fell out of the car. At trial, Serna denied being quite annoyed at having to walk to her car. She stated that she was actually calm and said, "Thank you for the ride; and I appreciate it. And I'll just walk back to my vehicle."

{¶ 17} Upon leaving the van, Serna ended up prone in the street, and the right rear tire of the van ran over the left side of her body, by her rib cage. Culver stated that he did not realize he had run over Serna. As he pulled away, he heard a thump and thought Serna had banged the side of his van. He then stopped the van to yell at Serna but saw that she was on all fours at the corner of Scioto and Finch. When Culver got out of the van to see if Serna was all right, she cursed at him and told him that he had just run over her with the van.

Culver attempted to pick Serna up from the ground, but she told him not to touch her. Instead of calling for help, Culver got in his van and left.

{¶ 18} Serna crawled about halfway across the street, was finally able to get to her feet, and went to a Domino's Pizza, which was still open. When she got there, she collapsed in the entryway, and the employees called 911 around 12:14 a.m. Ultimately, Serna was taken by care-flight to a hospital in Columbus, where her spleen was removed.

{¶ 19} When the police arrived at Domino's, Serna was screaming and was in a lot of pain. She told the officers the story related above, and they were able to track down Culver at his house by 12:35 a.m. The police recalled Culver from a field interview they had done a few months earlier when Culver was passed out in his van behind the Little Nashville Bar.

{¶ 20} At the time of the accident, Culver lived with his girlfriend, Robin Paton, and their eight-year-old daughter. Also living at the house were Paton's 19–year–old son, Jordan, and Robin's twin daughters, Ashley and Amanda. The twins slept in the basement.

{¶ 21} Jordan testified that he had arrived home around 11:10 p.m. that evening and began playing a computer game in his bedroom, which was located on the main floor of the house. Jordan thought Culver arrived home between 11:30 and midnight but said he did not have access to a clock. Robin's bedroom was also located on the main floor of the house, but Culver did not share the bedroom. Instead, he slept on the living room couch because he and Robin were not getting along.

{¶ 22} When Culver arrived home, Jordan peeked out from his room to see what Culver was doing and returned to playing his game. Jordan then heard Culver snoring. This was about half an hour after Culver arrived home.

{¶ 23} As we indicated, the police arrived at Culver's home at around 12:35 a.m. or about half an hour after the accident. After verifying that the van matched the description of the one involved in the accident, the officers knocked on the door and were admitted. Initially, Culver denied being in an accident. He said, instead, that he had dropped Serna off at the Logan Lodge and had gone directly home. At that point, the officers asked Culver to come to the police station for further questioning, and he voluntarily complied.

{¶ 24} The officer who interviewed Culver at the police station testified that Culver admitted that he had been drinking all evening and that he was probably driving under the influence. Culver again denied being in an accident and denied drinking after he got home. Because Culver appeared obviously intoxicated and admitted drinking, the police decided to administer a breath test. Unfortunately, the machine at the police department was not working properly, so the test was

not performed until around 5:00 a.m. at the Champaign County Sheriff's Office. At that time, the reading was .103 grams of alcohol per liters of breath.

{¶ 25} Using standard methodology called zero order kinetics, a toxicologist indicated at trial that Culver's blood-alcohol level would have been about .178 grams of alcohol per liters of breath at the time of accident. Based on this alcohol level, Culver would have had impaired sensory motor function and reaction times, impairment of peripheral vision, confusion, and loss of coordination. Overall, Culver would have been seriously impaired in driving an automobile. The toxicologist's opinion was based on Culver's not having ingested alcohol after the accident and on the assumption that any alcohol consumed would have been completely absorbed by the time of the test. In this regard, the toxicologist testified that complete absorption of alcohol ordinarily occurs on an empty stomach within 30 minutes. Depending on the amount of food in the stomach, however, complete absorption can take as long as three hours.

{¶ 26} At trial, Culvert testified that when he left the accident scene, he drove down the street to a Speedway station and bought cigarettes and a six-pack of beer. He claimed that he drank part of one beer in the van on the way home and took the remaining five beers into the house. Allegedly, in the half hour before the police arrived, Culver went down to the basement where his computer was located, checked his e-mail, and drank three or four more beers. He also claimed that he was in the Little Nashville Bar for only about an hour on the evening of the accident and that he purchased and ate a pizza on the way to the bar. Culvert did not offer any receipts for any of these purchases.

{¶ 27} The police found a partly consumed bottle of beer in the van, but they did not find any other beer bottles at Culver's house. They did not look in the basement because Culver did not say that he had had beer after the accident. In fact, Culver's statements to the police on the night of the accident were directly contrary to his testimony at trial, i.e., he specifically told the police that he did not have anything to drink after the accident.

{¶ 28} Furthermore, Culver's partner, Robin, testified about a conversation she had with Culver after he was originally released from jail. At that time, Culver said he left the accident scene, came home, and went to bed. Culver also told Robin that he intended to tell the police that he was drinking that night after he came home because the police had searched the top floor of the house but had not gone into the basement, where an accumulation of beer bottles was located. When Robin protested that Culver could not lie, Culver said he would say or do anything to keep from going to jail.

{¶ 29} After hearing the above evidence, the trial court found Culver guilty of vehicular assault and aggravated vehicular assault and not guilty of unlawful restraint. Because Culver had a prior conviction of vehicular manslaughter, the

aggravated-vehicular-assault charge was elevated to a second-degree felony. At sentencing, the state told the trial court that the two vehicular-assault charges were allied offenses of similar import and asked the court to sentence Culver only for the aggravated-vehicular-assault charge. The court then sentenced Culver to six years in prison and a driver's license suspension for 16 years for aggravated vehicular assault and did not impose sentence for vehicular assault. However, the court later filed an entry sentencing Culver to three years for vehicular assault and six years for aggravated vehicular assault, with the terms to run concurrently. The court also imposed fines of $500 on each charge, as well as a 16–year license suspension.

{¶ 30} As we noted, Culver claims in the first assignment of error that the evidence was insufficient as a matter of law to establish the offense of vehicular assault under R.C. 2903.08(A)(2). Culver focuses on the lack of evidence as to exactly how Serna was injured, as well as evidence indicating that the accident resulted from Serna's intoxication, not Culver's carelessness.

{¶ 31} When we review a verdict for sufficiency, we do not evaluate "whether the state's evidence is to be believed, but whether, if believed, the evidence against the defendant would support a conviction." *State v. Harr,* 158 Ohio App.3d 704, 718, 2004-Ohio-5771, 821 N.E.2d 1058, at ¶ 144. For purposes of the present case, the state was required to show that Culver, while operating a motor vehicle, recklessly caused serious physical harm to another person. R.C. 2903.08(A)(2)(b).

{¶ 32} A person is reckless "when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶ 33} If the testimony of the victim in this case is believed, Culver accelerated while the passenger door was open and the victim's body was partly out of the vehicle. Because injury is foreseeable whenever a vehicle moves when the door is open and a passenger is alighting, accelerating in such a situation shows a heedless disregard for the risk of injury. Accordingly, the circumstances of this case, even without the element of intoxication, would have justified a finding of vehicular assault.

{¶ 34} In addition to the above facts, there is evidence that Culver was under the influence of alcohol at the time of the accident. In this regard, a toxicologist testified that Culver's ability to drive an automobile would have been severely impaired at the time of the accident. A finding of recklessness may be

supported by evidence that a defendant was driving under the influence of alcohol. *State v. Ward,* Ross App. No. 03CA2703, 2003-Ohio-5847, 2003 WL 22476679, at ¶ 9. " 'A licensed driver is charged with the knowledge that driving while under the influence is against the law, and creates a substantial risk to himself and others.' " Id. at ¶ 9, quoting *State v. Hennessee* (1984), 13 Ohio App.3d 436, 439, 13 OBR 525, 469 N.E.2d 947.

{¶ 35} In *Ward,* the court found that sufficient evidence supported a conviction for aggravated vehicular homicide where the defendant's intoxication caused "decreased motor control, decreased attention, loss of critical judgment including the ability to make decisions, and impairment of memory including the ability to interpret what he sees." Id. at ¶ 11. The same factors are present in this case.

{¶ 36} According to Culver, the van was stopped when Serna got out. Culver also denied speeding up while Serna was still in the vehicle. Culver's position is that Serna's injuries were caused by her own intoxication, i.e., that Serna was injured when she tripped over a pothole and somehow fell under the rear wheel of the truck. Even if one accepts this testimony, the fact remains that Culver knew Serna was intoxicated. As a result, he should have made sure she was in a position of safety before pulling away.

{¶ 37} However, the trial judge did not have to accept Culver's account. Notably, the trial judge was in the best position to assess witness credibility. *State v. Padgett,* Montgomery App. No. 19590, 2003-Ohio-6242, 2003 WL 22764232, at ¶ 86. As we said, there is evidence that Culver accelerated or drove away while Serna was in the process of exiting the vehicle.

{¶ 38} Because the evidence was sufficient to support a conviction for vehicular assault, the first assignment of error is without merit and is overruled.

## II

{¶ 39} In the second assignment of error, Culver claims that the evidence was insufficient to establish the offense of aggravated vehicular assault under R.C. 2903.08(A)(1)(a). This statute prohibits any person from causing serious physical harm to another while operating a motor vehicle "[a]s the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance." As pertinent to this case, R.C. 4511.19(A) prohibits driving under the influence of alcohol.

{¶ 40} Although the blood-alcohol test in this case was conducted more than five hours after the accident, the defense concedes that the results may be properly admitted in evidence in a criminal prosecution for violation of R.C. 4511.19(A)(1). See *Newark v. Lucas* (1988), 40 Ohio St.3d 100, 104, 532 N.E.2d 130. The Ohio Supreme Court reasoned in *Lucas* :

{¶ 41} "In prosecutions for violations of such sections, the amount of alcohol found as a result of the chemical testing of bodily substances is only of secondary interest. * * * The defendant's ability to perceive, make judgments, coordinate movements, and safely operate a vehicle is at issue in the prosecution of a defendant under such section. It is the behavior of the defendant which is the crucial issue. The accuracy of the test is not the critical issue as it is in prosecutions for *per se* violations. * * * The test results, if probative, are merely considered in addition to all other evidence of impaired driving in a prosecution for this offense." Id.

{¶ 42} The court added that expert testimony would be needed in such cases to relate the "test results to the defendant and to the time of the alleged violation, as well as to relate the numerical figure representing a percentage of alcohol by weight in the bodily substance, as shown by the results of the chemical test, to the common understanding of what it is to be under the influence of alcohol." *Lucas*, 40 Ohio St.3d at 105, 532 N.E.2d 130.

{¶ 43} Consistent with *Lucas*, the state presented expert testimony relating the test results to the time of the violation. Culver challenges this testimony, however, claiming that there was no evidence of impaired driving. Culver further contends that the toxicologist's testimony should not have been given any weight, due to (1) evidence that the alcohol would not have been completely absorbed by the time of the test and (2) Culver's testimony that he drank several beers between the time of the accident and the time the test was administered. However, we disagree and find that the trial court was free to give any weight it desired to the expert testimony.

{¶ 44} As we have already stressed, the trial court did not have to believe any of Culver's testimony about what he ate or drank. None of this testimony was substantiated in any way, except that the police found an open beer in Culver's van. About one-fourth of the beer was missing. However, the beer could have been in the van for an hour, as Culver claimed, or for far longer, even a day or more. As proof that the beer had been recently purchased and opened, Culver relies on the fact that the beer was cold. However, the accident occurred during the month of January, and the weather was cold. The beer would, therefore, have been cold no matter how long it had been in the van.

{¶ 45} More important, however, is the fact that Culver's trial testimony was contradicted by statements he made to the police the night of the accident. As we mentioned earlier, Culver told the police he did not have anything to drink after the accident. In contrast, Culver testified at trial that he drank three or four beers in the basement in the space of about a half hour. If true, this behavior could have affected the test results. However, Culver also told his live-in companion that he would lie about drinking beer if necessary to keep from

going to jail. There was also evidence that Culver did not go in the basement when he returned home but simply went to sleep on the couch. In view of these inconsistencies in testimony, the trial court did not have to accept Culver's statement that he drank alcohol between the accident and the test. Furthermore, as the state points out, it makes no sense for Culver to have left an already open beer in his van and carry five unopened beers inside. The trial court could have found it implausible that an individual would drink three or four beers within the short space of half an hour. In this context, we note that the emergency call came in very shortly after the accident, around 12:14 a.m. By 12:35 a.m., the police were at Culver's house, and they spoke with Culver then.

{¶ 46} Furthermore, other evidence that Culver relies on was disputed. For example, Culver claims that he did not arrive at the bar until 11:00 p.m. and only drank one mixed drink. In contrast, the barmaid testified that Culver arrived at 8:00 or 9:00 p.m. and that she served him five drinks.

{¶ 47} We also note that even if the trial court believed that Culver ate pizza at 10:00 p.m., and Oreo cookies on the way home from the accident scene (around midnight or so), as Culver testified, it would not have affected the alcohol absorption. The toxicologist indicated that his conclusions were based on the assumption that complete absorption of alcohol had occurred. As we mentioned, complete absorption occurs within 30 minutes on an empty stomach. According to the toxicologist, food causes a slightly reduced rate of absorption. Depending on what is in the stomach, complete absorption can take between 30 minutes and three hours. Assuming for the sake of argument that Culver did eat some Oreo cookies at midnight, over five hours elapsed between that time and the test. Consequently, more than ample time existed for complete absorption to occur. As we stressed, however, the trial court did not have to accept any of Culver's testimony, particularly in view of Culver's own choice to give inconsistent accounts.

{¶ 48} On reviewing the evidence, we find more than sufficient evidence to sustain the conviction for aggravated vehicular assault. Accordingly, the second assignment is without merit and is overruled.

### III

{¶ 49} In the third assignment of error, Culver claims that the judgment is against the manifest weight of the evidence. In such situations, after reviewing the entire record, an appellate court " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins* (1997), 78 Ohio St.3d

380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Our discretion to grant a new trial " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " Id., quoting *Martin*.

{¶ 50} In arguing that the conviction is against the weight of the evidence, Culver contends that Serna's testimony is not entitled to any weight. In particular, Culver relies on the fact that the trial court acquitted him on an unlawful restraint charge. Culver also focuses on certain facts that support his own testimony, such as the stop at the Logan Lodge, where Serna asked for her relative, Faviola Stamper. According to Culver, this supports his testimony that the parties wanted to find a room where they could have sex and that they were continuing on to another motel when the accident occurred.

{¶ 51} As we stressed earlier, the trial court was in the best position to observe the witnesses and decide who gave more credible testimony. The fact that the court acquitted Culver of unlawful restraint does not mean that the court disbelieved Serna on all grounds, nor does it mean that the court should have accepted Culver's account. Whether Serna originally agreed to accompany Culver to a motel for sex is irrelevant to the charges involving vehicular assault. Regardless of any earlier agreement or discussion, the fact is that Serna subsequently left the vehicle and was injured as a result.

{¶ 52} Under the elements for aggravated vehicular assault, all the state needed to prove is that Culver caused serious physical harm to Serna with a motor vehicle as a proximate result of his being under the influence of alcohol. As we noted earlier, the toxicologist testified that Culver's ability to operate a vehicle would have been seriously impaired at the time of the accident. We also observed that the trial court could have chosen to believe Serna's testimony that her door was open and that she was partly out of the van when it accelerated.

{¶ 53} It is true that Serna's testimony at trial differed from the more detailed account she had given the police the night of the accident. However, the main differences related to alleged sexual advances by Culver in the car. At trial, Serna did not testify about these facts, the trial court probably acquitted Culver of unlawful restraint as a result. We note that Serna was seriously injured in the accident and the injury could well have accounted for her inability to remember some details. By the same token, Culver's testimony was contradicted by numerous witnesses, including the bartender at the Little Nashville and members of his own family. More important, Culver gave one account to the police at the time of the accident and then adopted a much more self-serving position at trial. For example, Culver told the police that he did not drink anything after the accident. At trial, he claimed to have downed three to four beers within a half hour—an account that, frankly, is unbelievable.

{¶ 54} We also think the evidence is more than adequate to sustain a finding that Culver recklessly caused Serna serious physical harm while operating a motor vehicle. As the state points out, Culver knew Serna was quite intoxicated but drove away before making sure she had reached a position of safety. In addition, Culver's own intoxication supported a finding of recklessness.

{¶ 55} Because the convictions were not against the manifest weight of the evidence, the third assignment of error is without merit and is overruled.

IV

{¶ 56} The fourth assignment of error challenges the imposition of $500 in fines. According to Culver, this fine violates the requirement in R.C. 2929.19(B)(6) that a court must consider an offender's present and future ability to pay before it can impose a financial sanction under R.C. 2929.18.

{¶ 57} The trial court does not need to hold a hearing on the issue of financial sanctions, and there are no express factors that the court must take into consideration or make on the record. See, e.g., *State v. Martin,* 140 Ohio App.3d 326, 338, 2000-Ohio-1942, 747 N.E.2d 318. The record should, however, contain "evidence that the trial court considered the offender's present and future ability to pay before imposing the sanction of restitution." *State v. Robinson,* Hancock App. No. 5-04-12, 2004-Ohio-5346, 2004 WL 2260101, at ¶ 17.

{¶ 58} We have previously upheld financial sanctions where the record includes documentation of a defendant's financial affairs, including a presentence investigation report, and the trial court indicates that it has considered the information in the report for sentencing purposes. See *State v. Parker,* Champaign App. No. 03CA0017, 2004-Ohio-1313, 2004 WL 541116, at ¶ 44 (relying on inferences in the record and judgment entry that the trial court did consider the defendant's present and future ability to pay fines and costs).

{¶ 59} As in *Parker,* we can infer from the record that the court considered Culver's ability to pay. Particular points at the sentencing hearing were Culver's then gainful employment, his long employment history, and the fact that he had always had the ability to work. At the time of the hearing, Culver was making $500 a week and had participated in building a number of fine homes in the local community. The court also inquired into Culver's assets. And finally, in the sentencing entry, the court deferred payment until two months after Culver was released from prison. Under the circumstances, we find that the court adequately considered Culver's present and future ability to pay. As a result, the fourth assignment of error is without merit and is overruled.

## V

{¶ 60} In the fifth assignment of error, Culver claims that the trial court erred in sentencing him for both vehicular assault and aggravated vehicular assault, since these crimes are allied offenses of similar import. Culver notes that the state itself asserted at the sentencing hearing that the offenses were allied offenses of similar import and elected, accordingly, to have Culver sentenced only for aggravated vehicular assault. However, when the sentencing entry was filed, the trial court also included a three-year sentence for vehicular assault and ordered that it be served concurrently with the sentence for aggravated vehicular assault. The court additionally included another $500 fine.

{¶ 61} The state does not dispute these facts, other than noting that the trial court did not say in the hearing why it sentenced Culver for only one charge. In contrast to its position at the hearing, the state now contends that the crimes are not allied offenses of similar import. The state also suggests that if any error occurred, the matter should simply be remanded so that Culver may be present when the sentence for the vehicular-assault conviction is imposed.

{¶ 62} At the sentencing hearing, the state did tell the trial court that the offenses were allied offenses of similar import. The state then chose to have Culver sentenced for aggravated vehicular assault. The trial court did not comment on the matter but did sentence Culver only for one charge—a clear implication that the court agreed with the state.

{¶ 63} Under R.C. 2941.25, the prosecution has the choice of electing which of one or more allied offenses it wishes to pursue. *State v. Redman* (1992), 81 Ohio App.3d 821, 823–824, 612 N.E.2d 416. To decide if offenses are allied, the statutorily defined elements are compared in the abstract. *State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, paragraph one of the syllabus. The applicable comparison follows:

{¶ 64} "If the elements of the crimes ' "correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import." ' * * * If the elements do not so correspond, the offenses are of dissimilar import and the court's inquiry ends—the multiple convictions are permitted." Id. at 636, 710 N.E.2d 699, quoting *State v. Jones* (1997), 78 Ohio St.3d 12, 13, 676 N.E.2d 80.

{¶ 65} After applying this test, we note that some elements of aggravated vehicular assault and vehicular assault are identical. Specifically, both crimes require that a defendant cause serious physical harm to a victim while the defendant is operating a motor vehicle. Vehicular assault requires the additional element that the defendant acted recklessly, while aggravated vehicular assault requires that the defendant be under the influence of alcohol, a drug of abuse, or

a combination of both. See R.C. 2903.08(A)(2), R.C. 2903.08(A)(1)(a), and R.C. 4511.19(A)(1)(a).

{¶ 66} The state contends that the offenses are not allied because an individual can be reckless without being under the influence of alcohol. We agree with the state.

{¶ 67} As a practical matter, many different types of conduct can be reckless in connection with operation of a vehicle. Speeding is just one example.

{¶ 68} In addition, the state points out that an individual can be under the influence of alcohol without being reckless. We also agree with this statement because R.C. 4511.19(A)(1)(a) imposes strict liability and does not require a culpable mental state. See, e.g., *State v. Moine* (1991), 72 Ohio App.3d 584, 587, 595 N.E.2d 524; *State v. Cleary* (1986), 22 Ohio St.3d 198, 199, 22 OBR 351, 490 N.E.2d 574; and *State v. Frazier,* Mahoning App. No. 01CA65, 2003-Ohio-1216, 2003 WL 1193782, at ¶ 14. As the court in *Moine* observed:

{¶ 69} "The language of R.C. 4511.19(A)(1) clearly indicates a purpose to impose strict liability, because the overall design of the statute is to protect against hazards to life, limb and property created by drivers who have consumed so much alcohol that their faculties are impaired. * * * The act of driving a vehicle while under the influence of alcohol (or drugs, or a combination of both) is a voluntary act in the eyes of the law, and the duty to refrain from doing so is one that in the interests of public safety must be enforced by strict criminal liability without the necessity of proving a culpable state of mind." *Moine,* 72 Ohio App.3d at 587, 595 N.E.2d 524, citing *State v. Grimsley* (1982), 3 Ohio App.3d 265, 267, 3 OBR 308, 444 N.E.2d 1071.

{¶ 70} Accordingly, because the elements of aggravated vehicular assault and vehicular assault do not correspond when the crimes are compared in the abstract, these offenses are not allied offenses of similar import. The trial court, therefore, could properly have sentenced Culver for both crimes. Unfortunately, however, the court failed to comply with sentencing requirements. Specifically, "a trial court errs when it issues a judgment entry imposing a sentence that differs from the sentence pronounced in the defendant's presence." *State v. Aliane,* Franklin App. No. 03AP–840, 2004-Ohio-3730, 2004 WL 1576407, at ¶ 8. The defendant has the right under Crim.R. 43(A) to be present at every stage of trial, including sentencing. Id. See, also, *State v. Ranieri* (1992), 84 Ohio App.3d 432, 434, 616 N.E.2d 1191 (vacating the defendant's sentence where the trial court modified the sentence in an entry filed after the sentencing hearing).

{¶ 71} Because the trial court improperly modified the sentence outside Culver's presence, we agree with the state that this matter should be remanded.

Consequently, the fifth assignment of error is sustained in part, and the sentence imposed for vehicular assault will be vacated.

{¶ 72} Based on the preceding discussion, assignments of error one, two, three, and four are overruled, and the fifth assignment of error is sustained in part. The sentence imposed for the vehicular assault conviction is vacated, and this matter is remanded for resentencing on that conviction. In all other respects, the judgment of the trial court is affirmed.

Judgment affirmed in part  
and reversed in part.

WOLFF and GRADY, JJ., concur.