[Cite as *State v. Cohen*, 2026-Ohio-410.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO, | Case No. 2025 CA 00025 |
| Plaintiff - Appellee | Opinion And Judgment Entry |
| -vs- | Appeal from the Fairfield County Municipal Court, Case No. TRC2405492 |
| DANIEL J. COHEN, | Judgment: Affirmed |
| Defendant – Appellant | Date of Judgment Entry: February 5, 2026 |

**BEFORE:** Craig R. Baldwin; Robert G. Montgomery; David M. Gormley, Judges

**APPEARANCES:** ANDREW D. SEMELSBERGER, for Plaintiff-Appellee; APRIL F. CAMPBELL, for Defendant-Appellee.

*Montgomery, J.*

{¶1} Defendant-Appellant, Daniel Cohen, appeals from the jury verdict of the Fairfield County Municipal Court finding him guilty of operating a vehicle under the influence, in violation of R.C. 4511.19(A)(1)(a). For the reasons below, we AFFIRM.

## STATEMENT OF THE CASE

{¶2} On August 1, 2024, Daniel Cohen ("Appellant") was arrested for operating a vehicle under the influence of alcohol, a drug of abuse, or a combination of them ("OVI"), in violation of R.C. 4511.19(A)(1)(a), a misdemeanor of the first degree. On September 12, 2024, Appellant was arraigned and entered a plea of not guilty. After multiple motions to continue, on June 24, 2025, a jury trial was held in the Fairfield County Municipal Court.

The State called two witnesses – eyewitness Lindsay Williams and Officer Warren, who responded to the 911 call. After the State rested, defense counsel moved for an acquittal pursuant to Crim.R. 29. The main argument presented by the defense throughout the trial was that Appellant inadvertently inhaled toxic solvents – namely Rust-Oleum and Hot Shot Fogger - while working on house renovations and said accidental or involuntary exposure caused significant impairment. Defense counsel characterized Appellant's condition as a "medical emergency." The trial court overruled the motion, and the defense proceeded to call four witnesses: Doctor Harry Plotnick, Appellant, and two co-workers, Miguel Mejia and Bright Bellis. After hearing all the evidence and arguments, the jury returned a guilty verdict.

{¶3} On June 25, 2025, Appellant was sentenced. The trial court imposed 170 days in jail, with 161 days suspended, gave credit for 1 day of jail previously served (for a total of 5 days in jail) and ordered Appellant to complete a driver's intervention program. The court imposed a fine of $375.00, court costs, and suspended Appellant's driver's license for one year from August 1, 2024, until August 1, 2025 – with limited driving privileges. The court further imposed 2 years of non-reporting probation. On July 17, 2025, Appellant filed a notice of appeal.

**STATEMENT OF FACTS**

{¶4} The record establishes the following facts. The State's first witness, Lindsay Williams, testified that on August 1, 2024, she and her husband were driving home shortly before midnight on Baltimore Road in Lancaster, Ohio, when they came upon an erratic driver. Ms. Williams called 911 and informed the dispatcher regarding what she observed

in real time.[1]  Ms. Williams stated, "[i]t didn't take us long to realize that, you know, something was not right."  *Trial Tr.*, at 101.  The Williamses decided to follow the driver until police arrived.  Ms. Williams testified regarding the erratic driving, that Appellant was "going about 20 miles per hour in a 45," "braking erratically," "speed[ing] up," then "slowing down," that he drove through stop signs, almost hit a guardrail, and went left of center several times - completely into the left lane and then back to the other lane.  *Id.*, at 101-104.

**{¶5}**   The State's second witness was Officer MacKenzie Warren ("Warren") who responded to the 911 call.  Warren testified that she has been a police officer for the Lancaster Police Department for over four years and described her training to the jury. She testified that as she approached the area, she observed Appellant roll through a stop sign and then turn his headlights off (in the pitch black).  Warren activated her overhead lights, but Appellant continued southbound without stopping. Because Appellant would not stop, Warren activated her sirens. Once he finally stopped, Warren approached the vehicle from the driver's side.

**{¶6}**   Warren quickly noticed that Appellant's eyes were very bloodshot and watery, he slurred his speech, and he struggled greatly to answer her simple, basic questions including where he had been, where he was going, and where he lived.  When Warren asked a question, Appellant would stare and say "um" and "ah," rather than specific answers.  *Id.*, at 117.  Warren further testified that Appellant had "the odor of an alcoholic beverage and burnt marijuana coming from the vehicle." *Id*.  When asked about Appellant's behavior during their interaction, Warren stated it was:

---

[1] Relevant portions of the 911 call were admitted into evidence as State's Exhibit 1 and were played for the jury.

A:     Up and down.

Q:     And what do you mean by that?

A.     He could go from being compliant still not necessarily answering my questions, but he would allow me the chance to speak to him. And then other times he would raise his voice, he would interrupt, constantly ask if there was something that we could work out to get away from this, do something else, have somebody pick him up.

*Id.*, at 118.

{¶7}   Warren described Appellant's behavior as confused, disoriented, and "lost." *Id.*, at 121. In addition to her testimony, Warren's body camera footage was admitted into evidence and relevant portions were played for the jury. Officer Warren asked, "[s]o how much have you had to drink tonight?" *Id.*, at 124. Appellant replied, "[n]ot very much. I mean, I would rather end it right here. And then I don't have to go anywhere." *Id*. Appellant did not know which city he was in, but believed it was Plain City, and he could not recall where he lived. Appellant struggled significantly to maintain simple, elementary conversation. Warren asked Appellant several times to agree to field sobriety tests but did not get a clear answer. Warren then asked:

Officer Warren: You want to get out and do them?

Mr. Cohen: Not really.

Officer Warren: Okay, well, I just need a yes or a no.

Mr. Cohen: No.

*Id.*, at 128.

{¶8} Thereafter, Warren instructed Appellant to exit his vehicle, and she placed him under arrest for OVI. Warren read Appellant his *Miranda* rights and when she did so, he became belligerent, interrupted her several times, and refused to answer her questions concerning whether he understood his rights. Warren walked Appellant to her cruiser and as she attempted to place him inside, he refused to get in and would put one leg in the car, then take it back out. Warren and the accompanying officer, Officer Stewart, searched Appellant's vehicle and found a full can of beer on the front passenger seat.

{¶9} Appellant testified on his own behalf. On the day in question, Appellant attended classes at Columbus State Community College and as he was leaving campus, he randomly ran into an acquaintance who gave him some marijuana. Appellant later went to the house he was renovating. When he arrived, Appellant stated he decided to smoke part of a marijuana joint (of several that he had) since no one was at the home and he thought "what the heck." *Id.*, at 208-209. Appellant performed manual labor at the house with a coworker Miguel Milla ("Milla"), and contractor, Brent Bellis ("Bellis"). Appellant left the property several times, one time with Bellis to purchase Rust-Oleum, an enamel-based paint that generally requires the user to wear a special face mask to avoid inhaling toxic fumes.

{¶10} When Appellant and Bellis returned, Milla also returned with a six-pack of Columbus Brewing IPA beer. Appellant claims he and Milla drank the beer outside at around 7:30 p.m. Appellant testified he drank about one and a half cans of beer and took a third beer with him when he left the home. Around 9:40, Appellant testified he was tired, stressed, and ready to go home but learned of an impending storm and decided to take a nap in his car. When Appellant woke up around 10:00 p.m., he testified he went inside

the house and again fell asleep. When he woke up again, Appellant stated he had a "[s]plitting headache," sore throat, his arms and legs felt like "Jello," his eyes burned, and he was not thinking clearly. *Id.*, at 224-226.

**{¶11}** At some point before Bellis left the home, he closed all the windows and doors and set off several Hot Shot Foggers to control an ongoing roach problem. Appellant claimed he was unaware any roach foggers were set off in the house before he fell asleep inside. Despite Appellant feeling terrible, he testified he left the house around 11:00 p.m. Appellant thought he headed towards Plain City, where he lives, but he in fact drove in the opposite direction towards Lancaster and was eventually stopped by Warren.

**{¶12}** Dr. Harry Plotnick testified as an expert in forensic toxicology, and he is also a licensed attorney. Dr. Plotnick testified that industrial solvents, such as Hot Shot Fogger and Rust-Oleum, are central nervous system depressants and can affect an individual's ability to do things in ways akin to alcohol or other depressants. *Id.*, at 168-169, 172. They can decrease reaction time, judgment, coordination, and balance. Dr. Plotnick confirmed that Hot Shot Fogger and Rust-Oleum paint products, to which Appellant was exposed, contain such toxins and have central nervous system depressant effects upon an individual. *Id.*, at 177-185.

**{¶13}** Dr. Plotnick opined that although Appellant had "numerous signs of impairment," he could not give an opinion to a reasonable degree of scientific certainty regarding the exact cause, meaning he could not say whether Appellant's impairment was caused by alcohol, marijuana, toxic solvent exposure, or a combination of these things. *Id.*, at 80-183. Dr. Plotnick, however, steadfastly opined that Appellant "was clearly impaired at the time he was stopped by the law enforcement officer." *Id.*, at 194.

{¶14} The remaining two defense witnesses included Appellant's coworkers on the house renovation project - Milla and Bellis. Milla worked at the house with Appellant on the day in question and essentially testified that the two shared a joint and drank some alcohol together while working. Bellis testified he worked at the home from around 4:00 to 10:30 p.m. and used Rust-Oleum, the heavy enamel paint that produces strong fumes. When Bellis later left the home, he closed all the windows and doors and set off approximately six Hot Shot foggers. Bellis explained that after bombs are set off, the space should be vacant for between three and twelve hours. As he was leaving, Bellis observed Appellant and Milla talking outside, in front of the house. *Id.*, at 256. Bellis testified that earlier in the day he told Appellant he was going to set off the roach bombs later in the evening but did not restate it upon leaving.

{¶15} After hearing all the evidence and arguments, the court gave the jury instructions. Despite defense counsel's main argument that Appellant accidentally or involuntarily became intoxicated due to toxic fumes, the court did not give an involuntary intoxication jury instruction. The jury returned a guilty verdict, finding Appellant guilty of violating R.C. 4511.19(A)(1)(a).

## ASSIGNMENTS OF ERROR

{¶16} "I. THE STATE'S EVIDENCE THAT COHEN COMMITTED A VIOLATION OF R.C. 4511.19(A)(1) WAS LEGALLY INSUFFICIENT."

{¶17} "II. COHEN'S CONVICTION SHOULD BE REVERSED BECAUSE THE EVIDENCE WEIGHED MANIFESTLY AGAINST CONVICTING COHEN OF OVI."

{¶18} "III. THE TRIAL COURT ABUSED ITS DISCRETION IN NOT INSTRUCTING THE JURY ON COHEN'S INVOLUNTARY INTOXICATION DEFENSE."

### *Jury Instruction – Involuntary Intoxication Defense*

**{¶19}** Because resolution of the third assignment of error impacts the other two, we address it first. In the third assignment of error, Appellant argues the trial court abused its discretion in not instructing the jury regarding Appellant's involuntary intoxication defense. We disagree. Appellate courts review a trial court's refusal to give a requested jury instruction under an abuse of discretion standard. *State v. Lottie*, 2023-Ohio-3738, ¶ 8 (5th Dist.); *State v. Everson*, 2016-Ohio-87, ¶ 58 (7th Dist.). Abuse of discretion implies that the court acted in an unreasonable, arbitrary, or unconscionable manner. *State v. Herring*, 2002-Ohio-796.

**{¶20}** As stated, Appellant was convicted of R.C. 4511.19(A)(1)(a). The statute provides: "No person shall operate any vehicle * * * within this state, if, at the time of the operation, * * * [t]he person is under the influence of alcohol, a drug of abuse, or a combination of them." It is true that involuntary intoxication can sometimes be an affirmative defense, for which a defendant bears the burden of proof by a preponderance of evidence. *State v. Tussing*, 2024-Ohio-5757, ¶ 18 (3d Dist.). However, where the statute intends to impose strict liability for doing an act, the defense is not available.

**{¶21}** Strict liability offenses "impose liability for simply doing a prohibited act." *State v. Johnson*, 2020-Ohio-6301, ¶ 17, see *State v. Ferguson,* 2008-Ohio-6677, ¶ 73 (10th Dist.). To impose strict liability, "the statute must clearly show such legislative intent." *State v. Moody*, 2004-Ohio-6395, ¶ 6. Although the fact that the statute contains the phrase "no person shall" do an act is relevant, the phrase alone is not determinative of strict liability. *Id.*, at ¶ 16, citing *State v. Collins*, 2000-Ohio-231. Generally, statutes that are regulatory in nature or intended to protect public safety, health, and well-being

are considered strict liability statutes. *See,* e.g., *State v. Wilson,* 1991 WL 115985 at *2 (5th Dist. June 13, 1991) (finding R.C. 4301.69 to impose strict liability); see *generally State v. Buehler Food Markets, Inc.,* 50 Ohio App.3d 29 (9th Dist. 1989).

{¶22} The Ohio Supreme Court has held that "R.C. 2901.21(B) sets forth the requisite test for determining whether a criminal statute is a strict-liability offense." *Moody*, ¶ 4.  In turn, R.C. 2901.21 provides as follows:

> (B) When the language defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in the section, then culpability is not required for a person to be guilty of the offense.
>
> (C)(1) When language defining an element of an offense that is related to knowledge or intent or to which mens rea could fairly be applied neither specifies culpability nor plainly indicates a purpose to impose strict liability, the element of the offense is established only if a person acts recklessly.
>
> (2) Division (C)(1) of this section does not apply to offenses defined in Title XLV [45] of the Revised Code.

{¶23} Thus, when there is "no degree of culpability" specified in the section defining an offense, and it "plainly indicates a purpose to impose strict criminal liability, * * * then culpability is not required for a person to be guilty of the offense." *Id.*  If the section does not specify "culpability [or] plainly indicate a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense" except that recklessness is not to be read into an element of any offenses in Revised Code Title 45. *See* R.C. 2901.21(B) and (C)(1)-(2); see also *State v. Smith*, 2014-Ohio-4030, ¶ 8.  Here, the OVI

statute is contained in Title 45 of the Revised Code, such that even recklessness is not required to prove an offense.

{¶24} Indeed, the Ohio Supreme Court has held that "R.C. 4511.19 is a strict liability statute." *City of Defiance v. Kretz*, 60 Ohio St.3d 1, 3 (1991) (analyzing R.C. 4511.19(A)(3)), citing, *State v. Cleary*, 22 Ohio St. 3d 198 (1986), *superseded by statute on other grounds* (other citations omitted); *City of Akron v. Wanakie Peoples*, 2011-Ohio-579, ¶ 10 (9th Dist.) (holding that defendant failed to present evidence that her taking the medications, classified as drugs of abuse, was involuntary, because even if one or more of the medications caused defendant's intoxication, defendant ingested the medications even though she was aware that she had a general sensitivity to medication); *State v. Eveland*, 1988 Ohio App. Lexis 1053, *7-8 (4th Dist.) (finding that R.C. 4511.19 does not define any degree of culpability but *does* indicate a purpose to impose strict liability.); *see also State v. Fox*, 68 Ohio St.2d 53, 56 (1981) (stating that generally, the issue of voluntary intoxication arises in cases where intent is an element of the crime, such as in murder; however, under R.C. 4511.19 intent is not an issue because in a manner of speaking, no one intends to operate a motor vehicle under the influence the way a thief intends to steal or a murderer to kill).

{¶25} Several Ohio district courts have similarly held that R.C. 4511.19(A)(1) imposes strict liability.

> The language of R.C. 4511.19(A)(1) clearly indicates a purpose to impose strict liability, because the overall design of the statute is to protect against hazards to life, limb, and property created by drivers who have consumed so much alcohol that their faculties are impaired. * * * The act of driving a

vehicle while under the influence of alcohol (or drugs, or a combination of both) is a voluntary act in the eyes of the law, and the duty to refrain from doing so is one that in the interests of public safety must be enforced by strict criminal liability without the necessity of proving a culpable state of mind.

*State v. Harding*, 2006-Ohio-481, ¶ 16 (2d Dist.), citing *State v. Culver,* 2005-Ohio-1359 (2d Dist.) (other citation omitted); *Eveland*, supra; *State v. Jones*, 2010-Ohio-2777, ¶ 19 (8th Dist.) (stating involuntary intoxication is not a defense to driving under the influence of drugs or alcohol); *State v. Andera*, 2010-Ohio-3304 (8th Dist.) (R.C. 4511.19(A)(1)(a) is a strict liability statute.).

**{¶26}** We agree that R.C. 4511.19(A)(1)(a) is a strict liability statute intended to protect the public and prohibit the act of an individual driving under the influence. Because we conclude that R.C. 4511.19(A)(1)(a) is a strict liability statute, the trial court did not abuse its discretion in refusing to give the jury instruction regarding involuntary intoxication. Accordingly, Appellant's third assignment of error is overruled.

### *Sufficiency of Evidence – 4511.19(A)(1)(a)*

**{¶27}** Appellant's first assignment of error argues that the State's evidence is insufficient to support his conviction. Appellant claims the statute does not cover accidental or involuntary intoxication and requires an actus reus, meaning an affirmative, voluntary act. Again, Appellant's argument is misplaced.

**{¶28}** Regarding sufficiency, the Ohio Supreme Court held as follows in *Jenks*:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶29}** A sufficiency-of-the-evidence challenge asks whether the evidence is "legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 2011-Ohio-4215, ¶ 219; *State v. Worley,* 2021-Ohio-2207, ¶57; *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). To reverse, a majority of the appellate panel must determine that " 'reasonable minds could not reach the conclusion reached by the trier-of-fact.' " *State v. Ketterer,* 2006-Ohio-5283, ¶ 94, quoting *State v. Dennis,* 79 Ohio St.3d 421, 430 (1997).

**{¶30}** Proof of guilt may be made by circumstantial evidence and/or direct evidence. *City of Brook Park v. Gannon*, 2019-Ohio-2224, ¶ 24, citing *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.), citing *State v. Nicely*, 39 Ohio St.3d 147 (1988). Direct evidence exists when the witness testifies about a matter within the witness' personal knowledge, and the trier of fact is not required to draw any inferences. *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). In contrast, "circumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence." *Id.*; *see also State v. Hartman*, 2008-Ohio-3683, ¶ 37 (8th Dist.). Circumstantial evidence and direct evidence are completely equal in terms of probative value. *Jenks*, at 259.

**{¶31}** As stated, Appellant was convicted of a violation of R.C. 4511.19(A)(1)(a). The statute provides: "No person shall operate any vehicle * * * within this state, if, at the time of the operation, * * * [t]he person is under the influence of alcohol, a drug of abuse, or a combination of them." A drug of "abuse" includes any controlled substance, such as alcohol, marijuana, a "harmful intoxicant,"[2] as defined in R.C. 2925.01, or any combination. Based on the testimony of Dr. Plotnick, there is no serious dispute that Hot Shot Fogger and Rust-Oleum fit within the definition of "harmful intoxicant." The term "under the influence" means that the defendant consumed alcohol or a drug of abuse, in such a quantity, whether small or great, that it adversely affected and "appreciably impaired the defendant's actions, reactions, or mental processes under the circumstances then existing." *State v. Harding*, 2006-Ohio-481, ¶ 11 (2d Dist.), citing 4 Ohio Jury Instructions 6, Section 545.25; *see also*, *State v. Hardy*, 28 Ohio St.2d 89 (1971).

**{¶32}** Importantly, because OVI is a strict liability offense, the State need only prove that an offender was "under the influence" of alcohol, a drug of abuse, or some combination, while operating a vehicle. *Harding*, supra; *Andera*, supra. In other words,

---

[2] A "harmful intoxicant" is defined by the Revised Code, and the jury was instructed by the trial court, as follows: "Harmful intoxicant" does not include beer or intoxicating liquor but means any of the following:

(1) Any compound, mixture, preparation, or substance the gas, fumes, or vapor of which when inhaled can induce intoxication, excitement, giddiness, irrational behavior, depression, stupefaction, paralysis, unconsciousness, asphyxiation, or other harmful physiological effects, and includes, but is not limited to, any of the following:
(a) Any volatile organic solvent, plastic cement, model cement,
fingernail polish remover, lacquer thinner, cleaning fluid, gasoline, or
other preparation containing a volatile organic solvent;
(b) Any aerosol propellant;
(c) Any fluorocarbon refrigerant;
(d) Any anesthetic gas.
* * *
R.C. 2925.01(I)(1)(a)-(d ).

the relevant question is whether Appellant's ability to operate a vehicle was appreciably impaired as the result of being under the influence.

**{¶33}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could conclude that the State proved the essential elements of OVI beyond a reasonable doubt. Williams testified in detail regarding Appellant's erratic driving. Appellant was "going about 20 miles per hour in a 45," "braking erratically," "speed[ing] up," then "slowing down," driving through stop signs, almost hitting a guardrail, and went left of center several times – meaning completely into the opposite lane of travel. *Trial Tr.*, at 101-104. Warren testified in detail regarding Appellant's behavior at the scene and thereafter. Warren's body cam footage was also admitted into evidence and played for the jury. The jury observed Appellant's significant impairment at the time he was pulled over and ultimately arrested. Appellant was stupefied, behaving irrationally at times, and could not engage in elementary level conversation.

**{¶34}** Warren also testified that upon approaching Appellant's vehicle, she smelled alcohol and burnt marijuana. Appellant admitted to voluntarily drinking alcohol and smoking marijuana that day, and accidentally inhaled toxic fumes. Indeed, Appellant testified that when he left the house, he felt terrible - his arms and legs felt like "Jello." Defense counsel even characterized Appellant's condition as a "medical emergency," and yet instead of calling 911 or someone else, Appellant decided to get behind the wheel and drive home. Without question, sufficient evidence exists to support Appellant's conviction. Appellant's first assignment of error is overruled.

*Manifest Weight of the Evidence*

**{¶35}** Appellant's second assignment of error claims that his conviction is against the manifest weight of the evidence. Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Williams*, 2003-Ohio-4396, ¶ 83. When a court of appeals reverses a judgment of a trial court as against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of conflicting testimony. *State v. Jordan*, 2023-Ohio-3800; *Thompkins* at 387; *Williams,* ¶ 60. The reviewing court must determine whether the jury clearly "lost its way and created such a manifest miscarriage of justice" that the conviction cannot stand, and a new trial must be ordered. *Id.*, quoting *State v. Group*, 2002-Ohio-7247, ¶ 77 (citations omitted). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the exceptional case in which the evidence weighs heavily against the conviction. *State v. Dotson*, 2017-Ohio-5565, ¶ 1 (5th Dist.).

**{¶36}** In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact. *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 21; *In re Z.C.*, 2023-Ohio-4703, ¶ 14. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the [trier of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). In determining whether a witness is credible, the trier of fact is in the best position to consider inconsistencies in testimony, as well as the witnesses' demeanor and manner of testifying. *Dotson*, ¶ 50. A jury is free

to believe all, part, or none of any witness's testimony. *State v. Raver,* 2003-Ohio-958, ¶21 (10th Dist.), citing *State v. Antill,* 176 Ohio St. 61, 67 (1964). A defendant is not entitled to a reversal on manifest weight grounds simply because there was inconsistent evidence presented at trial. *Id.*; *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). If the evidence is susceptible to one or more interpretations, a reviewing court must interpret it in a manner consistent with the verdict. *Dotson*, ¶ 49.

{¶37} The totality of the evidence in this case clearly supports the inference that Appellant was operating a vehicle while under the influence of alcohol, a drug of abuse, or a combination of both. As set forth above, the State's evidence demonstrated Appellant's unequivocal impairment while driving. Upon Warren's arrival at the scene, Appellant's eyes were bloodshot red, his speech was slurred, he did not know where he was, and he could not answer basic questions or engage in a simple conversation. Warren further testified that she smelled "burnt" marijuana and alcohol when she approached the vehicle. Appellant admitted to voluntarily consuming alcohol and marijuana that day. It is plausible that the jury outright rejected Appellant's claims that he did not drink or smoke much, or did so much earlier in the day, claims repeatedly made by defense counsel.

{¶38} In essence, the jury believed the State's theory of the case. "Simply because the jury believed the State's evidence over Appellant's does not render Appellant's conviction against the manifest weight of the evidence." *State v. Bradley,* 2025-Ohio-4981, ¶ 16 (5th Dist.). Moreover, if the evidence is susceptible to one or more interpretations, a reviewing court must interpret it in a manner consistent with the verdict. *Dotson*, ¶ 49. Based on the totality of evidence, we conclude the jury did not clearly lose

its way or create such a manifest miscarriage of justice that the conviction cannot stand. Accordingly, Appellant's conviction was not against the manifest weight of the evidence and the second assignment of error is overruled.

## **CONCLUSION**

**{¶39}** Appellant's first, second, and third assignments of error are overruled in their entirety.

**{¶40}** For the reasons stated in our accompanying Opinion, the judgment of the Fairfield County Municipal Court is Affirmed.

**{¶41}** Costs to Appellant.

By: Montgomery, J.

Baldwin, P.J. and

Gormley, J. concur.