[Cite as *State v. Boscarino*, 2014-Ohio-1270.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                       :        C.A. CASE NO.    25586

v.                                               :        T.C. NO.    12CRB6314

THOMAS BOSCARINO                                 :        (Criminal appeal from
                                             Municipal Court)

    Defendant-Appellant                      :

                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    28th    day of     March    , 2014.

. . . . . . . . . .

AMY B. MUSTO, Atty. Reg. No. 0071514, Assistant City Prosecutor, 335 W. Third Street, Room 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P. O. Box 341021, Beavercreek, Ohio 45434
        Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

      **{¶ 1}**   Thomas Boscarino was found guilty after a jury trial in the Dayton

Municipal Court of gambling, in violation of R.C. 2915.02(A)(2); activities prohibited without a permit, in violation of R.C. 4301.58(B); and operating a gambling house, in violation of R.C. 2915.03. All of these offenses were first-degree misdemeanors. After a bench trial, the trial court also found Boscarino guilty of keeping a place where intoxicating liquors are sold in violation of law, in violation of R.C. 4399.09, an unclassified misdemeanor.

{¶ 2} For the first-degree misdemeanors, the court imposed concurrent sentences of 180 days in jail, all of which were suspended, and one year of non-reporting community control, with a condition that Boscarino complete 500 hours of community service within approximately 15 weeks. The court imposed $1,000 fines for the three offenses, for a total of $3,000, and court costs, including jury costs. The court imposed a $500 fine for the keeping a place charge. The sentences were stayed pending appeal.

{¶ 3} Boscarino appeals from his convictions. He claims that his convictions were based on insufficient evidence and were against the manifest weight of the evidence, that he was denied effective assistance of counsel, that he was the victim of selective prosecution, and that the trial court abused its discretion at sentencing. For the following reasons, the portion of the trial court's sentence requiring community service as a condition of community control will be reversed, and the matter will be remanded for resentencing on that condition; in all other respects, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 4} The State's evidence at trial established the following facts.

{¶ 5} Thomas Boscarino rented the IUE-CWA Union Hall on Woodman Avenue

in Dayton to hold a fundraising event for his adult son, Nikolaos, on July 28, 2012. Nikolaos had been involved in a physical altercation with police officers, resulting in legal and medical expenses. Neither Boscarino nor the union hall had a liquor permit issued by the State of Ohio. Boscarino did not rent the facility for use by a non-profit charitable organization, as recognized by the IRS.

{¶ 6} On the day of the event (July 28), the Dayton Police Department received a complaint that Boscarino would be holding an event involving illegal gambling and illegal liquor sales at the IUE Hall. Lieutenant Stivers called Sergeant Gary Lowe, who then contacted Detective Raymond St. Clair and asked him (St. Clair) to contact Detectives Thomas Oney and Doug George to see if they would conduct an undercover investigation. Detectives Oney and George agreed to participate in the investigation, and they reported to work at 8:00 p.m.

{¶ 7} At St. Clair's request, at approximately 8:30 p.m., Detective Oney conducted surveillance of the IUE hall and observed people "coming and going from it." Outside was a sign advertising, "Sat 28 July 5 PM to MID, $15 donation, all you can eat pizza and beer." Meanwhile, Detective George investigated whether the IUE Hall had a valid liquor permit for that day; he discovered that it did not. The detectives returned to their office and reported what they had learned.

{¶ 8} At approximately 10:00 p.m., Detectives Oney and George went to the IUE Hall, in plain clothes, to enter the facility. Co-defendant Kenneth Wise was blocking the doorway to the hall. The detectives paid him the requested $15 donation and were provided an orange wristband and cup. Upon entering, they went to the bar area near the kitchen,

where Detective Oney, without additional payment, obtained a glass of Sunset Wheat beer from co-defendant Ryan Hilgeman. A sign above the bar counter indicated suggested "donations" for liquor drinks. While Detective Oney went to the restroom, Detective George obtained a beer and shot of Jack Daniel's from Hilgeman. George paid $2 for the shot of liquor. The detectives then got pizza from another table.

{¶ 9} The detectives noticed people playing cards on the other side of the IUE Hall. They went over and saw that the individuals were playing Texas Hold 'Em, a "standard poker game." The dealer for the table was co-defendant Jay Bakhshi. As the games were played, people placed bets with poker chips in accordance to Texas Hold 'Em rules. Once the hand was completed, the chips were raked in and counted by Bakhshi. Bakhshi took a small percentage of the chips from the table, placed them in a small plastic container that was sitting on a seat to his left, and then gave the remainder of the "pot" to the winning player. The detectives recognized that the amount taken by Bakhshi was a "cut," a portion retained by the "house" as profit for whoever is operating the game.

{¶ 10} After watching a few hands, Detective Oney went back to the kitchen area and purchased $25 of poker chips from co-defendant Demetria Boscarino. She gave Oney black and white poker chips, and she identified which chips were worth $1 (white) and which were worth $5 (black). When a seat opened up at Bakhshi's table, Oney began to play. He asked Bakhshi what the cut was, and Bakhshi indicated it was about ten percent, meaning the house would retain ten percent of the value of the pot once the hand was completed. After losing all of his chips, he returned to the bar area and purchased another $25 worth of chips from Hilgeman.

{¶ 11}   As Oney began to play again, Boscarino stepped onto a small stage, holding a laptop computer.   He got people's attention, and everyone stopped what they were doing to listen.   Boscarino thanked everyone for coming and indicated that there were two Dayton police officers at the event; Oney testified that people started staring at him and Detective George.   Boscarino began speaking about the arrest of his son, the legal system, and the amount he had spent on his son's defense.   Boscarino also indicated that he would arrange a ride home for anyone who was unable to drive.

{¶ 12}   Boscarino appeared to the officers to be the organizer of the event. Detective Oney had observed Boscarino throughout the evening.   He saw Boscarino near the front door area, walking around speaking to people, helping to get poker chips from a cabinet, and giving his speech.

{¶ 13}   After Boscarino concluded his speech, Detective Oney contacted his supervisor and informed him that his and Detective George's identities had been compromised, that beer was being sold, and that Texas Hold 'Em was being played with a cut.   Players resumed playing poker, and Detective George purchased $40 worth of poker chips from Bakhshi and sat down to play.   At this time, Bakhshi brought out a sign describing the game and method of donation.   Bakhshi also began asking the players if it were alright if they contributed a ten percent donation.   Detective Oney also resumed playing until uniformed officers and other detectives arrived.

{¶ 14}   When uniformed police officers arrived, the IUE Hall was "locked down" and Detective George identified some of the people that he observed engaging in illegal activity.   Numerous items were collected pursuant to a search warrant.   Those items included poker chips, cards, kegs of beer, bottles of liquor, a television, a computer, invoices,

flyers, money totaling $2,561.25, a vial of Miller Lite beer and a vial of Jack Daniel's, cups, and wrist bands. The Miami Valley Regional Crime Lab determined that the Miller Lite sample contained 3.3 percent ethyl alcohol (or ethanol) by volume and the Jack Daniel's sample contained 29.1 percent ethyl alcohol by volume.

{¶ 15} Boscarino was arrested and charged by complaint with gambling, activities without a permit, operating a gambling house, and keeping a place where intoxicating liquors are sold in violation of law. Upon motions by Boscarino and the State, the case was consolidated with those of Boscarino's five co-defendants.[1] (The case of one co-defendant was later severed due to scheduling issues.)

{¶ 16} A jury trial was held on November 8 and 9 as to the three first-degree misdemeanor charges, and the keeping a place charge, an unclassified misdemeanor, was tried simultaneously to the judge. The jury found Boscarino guilty of the three first-degree misdemeanors, and the trial court found him guilty of the unclassified misdemeanor. On January 7, 2013, the trial court sentenced Boscarino to a suspended 180-day jail sentence, one year of non-reporting community control (with a condition that he perform 500 hours of community service by April 19, 2013), fines totaling $3,500, and court costs.

{¶ 17} Boscarino appeals from his convictions, raising five assignments of error.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 18} Boscarino's first and second assignments of error claim that his convictions were based on insufficient evidence and were against the manifest weight of the evidence.

{¶ 19} "A sufficiency of the evidence argument disputes whether the State has

---

[1] Boscarino was tried jointly with Kenneth Wise, Ryan Hilgeman, Demitria Boscarino, and Jay Bakhshi.

presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 20} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 21} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular

witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶ 22} Boscarino was convicted of gambling, in violation of R.C. 2915.02(A)(2); activities without a permit, in violation of R.C. 4301.58(B); operating a gambling house, in violation of R.C. 2915.03; and keeping a place where intoxicating liquors are sold in violation of law, in violation of R.C. 4399.09.

{¶ 23} R.C. 2915.02(A)(2), the gambling statute, states that no person shall "[e]stablish, promote, or operate or knowingly engage in conduct that facilitates any game of chance conducted for profit or any scheme of chance." R.C. 2915.01(E) defines "game of chance conducted for profit" to mean "any game of chance designed to produce income for the person who conducts or operates the game of chance, but does not include bingo." "Game of chance" means "poker, craps, roulette, or other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely by chance, but does not include bingo." R.C. 2915.01(D). For purposes of R.C. 2915.02(A)(2), a person facilitates a game of chance conducted for profit if the person in any way knowingly aids in the conduct or operation of any such game, including, without limitation, playing any such game. R.C. 2915.02(B).

{¶ 24} R.C. 2915.02(D) provides an exception to gambling conducted by non-profit charitable organizations, as recognized by the IRS, under certain circumstances; however, the evidence at trial established that Boscarino was not operating as a non-profit charitable organization and that this exception does not apply.

{¶ 25} Boscarino argues that his conviction for gambling should be reversed for three reasons. First, he asserts Texas Hold 'Em is not a "game of chance." R.C. 2915.01(D) defines poker as a "game of chance," and both Detective Oney and Detective George (and defense witness Roger Wells) testified that Texas Hold 'Em was a form of poker. Although there was some evidence that skillful bluffing plays a role in winning poker hands, the State provided sufficient evidence that the card game at issue (Texas Hold 'Em) was a "game of chance," i.e., a form of poker, and that Boscarino engaged in conduct that promoted a game of chance. The jury did not lose its way in reaching that conclusion.

{¶ 26} Second, Boscarino claims that there was no evidence that he was going to profit from the fundraiser. He argues that there was no evidence that he was in the business of gambling and, further, that any profits from the fundraiser would go to his son.

{¶ 27} Upon review of the record, the State presented evidence that the Texas Hold 'Em table was a "game of chance conducted for profit," i.e., it was "designed to produce income for the person who conducts or operates the game of chance." *See* R.C. 2915.01(E). The State's evidence demonstrated that Boscarino rented the union hall and organized the July 28, 2012 event. Boscarino assisted with the poker chips, checked on the front door, mingled with guests, and gave a speech; he acknowledged that he was in charge of the event while speaking with Detective St. Clair and admitted that he did not have a 501(c)(3)

charitable organization letter. Detectives Oney and George testified that ten percent of the poker pot went to the "house" at the end of each hand. Accordingly, the State presented evidence from which the jury could reasonably infer that the poker table was designed to produce income for Boscarino, as the organizer of the event. The fact that Boscarino intended to use those profits to help his son financially does not compel the conclusion that his conviction was based on insufficient evidence or was against the manifest weight of the evidence.

{¶ 28} Third, Boscarino asserts that R.C. 2915.02(D) was not intended to apply to his event, as a one-time fundraiser. Boscarino emphasizes the 1973 Legislative Service Committee's commentary that "[t]his section is aimed at suppressing the business of gambling, and prohibits gambling for profit, as well as various peripheral activities which support it. It does not prohibit gambling (other than bookmaking) which is not conducted for profit." The comments note that the prohibitions in R.C. 2915.02 reach "not only the bookie, the casino operator, and the manager of a floating crap game, but also the clerk of the handbook, the dealer, and the person who places a bet with a bookie or plays an illicit game or scheme."

{¶ 29} Additional comments by the Legislative Service Committee further illustrate, however, that the reach of R.C. 2915.02 extends beyond gambling business operations. It reads, in part:

> The penny-ante poker game in one's own home with friends, the dime-a-hole Saturday golf match, and the office football pool are not prohibited, unless some profit is taken other than the gain accruing to a winner. If a nominal

charge is made for admission or for a seat in the game, or a small percentage of the pot or pool is taken, or the house takes an edge in the odds, then profit enters the picture.

**{¶ 30}** The evidence at trial reveals that Boscarino organized the July 28, 2012 event to be a fundraiser for his son's legal and medical expenses. Although there is no evidence that Boscarino conducted similar gambling operations on an ongoing basis, his actions on July 28 fell within the scope of R.C. 2915.02 when a percentage of the pot was taken by the dealer at the poker table. Boscarino's gambling conviction was based on sufficient evidence and was not against the manifest weight of the evidence.

**{¶ 31}** The operating a gambling house statute, R.C. 2915.03(A)(1), provides: "No person, being the owner or lessee, or having custody, control, or supervision of premises, shall: (1) Use or occupy such premises for gambling in violation of section 2915.02 of the Revised Code[.]" The Ohio Supreme Court has interpreted this section to be a strict liability offense. *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 33; *State v. Wac*, 68 Ohio St.2d 84, 87, 428 N.E.2d 428 (1981).

**{¶ 32}** Tyra Williams, union representative for IUE-CWA Local 755, testified that Boscarino signed a contract to rent the union hall on July 28, 2012. As discussed above, the State's evidence supported the jury's conclusion that Boscarino used the premises for gambling, in violation of R.C. 2915.02. Boscarino's conviction for operating a gambling house was based on sufficient evidence and was not against the manifest weight of the evidence.

**{¶ 33}** R.C. 4301.58, defining activities prohibited without a permit, provides in

part:

> (B) No person, personally or by the person's clerk, agent, or employee, who is not the holder of an A, B, C, D, E, F, G, I, or S permit issued by the division, in force at the time, and authorizing the sale of beer, intoxicating liquor, or alcohol, or who is not an agent or employee of the division or the tax commissioner authorized to sell such beer, intoxicating liquor, or alcohol, shall sell, keep, or possess beer, intoxicating liquor, or alcohol for sale to any persons other than those authorized by Chapters 4301. and 4303. of the Revised Code to purchase any beer or intoxicating liquor, or sell any alcohol at retail. This division does not apply to or affect the sale or possession for sale of any low-alcohol beverage.[2]

**{¶ 34}** Boscarino argues that no beer was "sold" at the July 28 event. He states that the sign out front suggested a $15 donation to enter the event, but once they were inside, attendees could have all the free beer and pizza they wanted. He further states that the sign for liquor drinks suggested a "donation," not a sale price.

**{¶ 35}** Boscarino relies on *Bishop v. Carpenter's Local Union #126*, 1st Dist. Hamilton No. C-070591, 2008-Ohio-2846, to support his argument that the $15 fee and

---

[2] The definitions for beer, alcohol, intoxicating liquor, and low-alcohol beverage are provided in R.C. 4301.01. "Alcohol" means ethyl alcohol, but not denatured alcohol or wood alcohol. R.C. 4301.01(B)(1). The terms "intoxicating liquor" and "liquor" include "all liquids and compounds, other than beer, containing one-half of one per cent or more of alcohol by volume which are fit to use for beverage purposes * * *." R.C. 4301.01(A)(1). "Beer" includes "all beverages brewed or fermented wholly or in part from malt products and containing one-half of one per cent or more, but not more than twelve percent, of alcohol by volume." R.C. 4301.01(B)(2). "Low-alcohol beverage" is defined as "any brewed or fermented malt product, or any product made from the fermented juices of grapes, fruits, or other agricultural products, that contains no alcohol or less than one-half of one per cent of alcohol by volume." R.C. 4301.01(B)(20).

suggested donation amounts for liquor did not constitute the sale of alcoholic beverages. In *Bishop*, a union held its annual picnic at a park that included picnic grounds, rides, and other facilities. As part of the activity, the union purchased 30 half-barrels of beer which, by contract with the supplier, had to be provided gratis to attendees. Union members and their families were admitted to the event for free, the union distributed many complimentary tickets before the event, and the public could attend with an admission charge. Upon admission, attendees received free beer and food and free use of the park's rides and other recreational facilities. The union and beer supplier were sued after an attendee was involved in a fatal motor vehicle accident after leaving the picnic.

{¶ 36} Addressing the plaintiff's claim that the union had sold beer, in violation of R.C. 4301.58, to those who paid to attend the picnic, the First District stated: "Those who did pay an admission fee for the picnic were not purchasing alcohol; they were paying to attend the picnic, which included food and the use of the park's many recreational facilities. The union purchased the beer from Stricker's Grove and was required by contract to offer the beer free of charge. There was no showing that the union had a profit motive in offering the beer or that it had used the offer of free beer to induce the general public, or any other patrons, to attend the event." *Bishop* at ¶ 12.

{¶ 37} The First District relied on *Stevens v. United Auto Workers, Local 1112*, 110 Ohio App.3d 153, 673 N.E.2d 930 (7th Dist.1996), involving a fundraiser at a union hall for an injured worker. In *Stevens*, the evidence indicated that co-workers had all contributed money to pay for the beer and soft drinks that were served at the fundraiser. A flyer for the event advertised that beer and soft drinks would be free, and that there would be donations

for the hot dogs. Only hot dogs were "sold" or exchanged for donations at the fundraiser. Under those circumstances, the Seventh District found no evidence that beer was sold at the fundraiser.

{¶ 38} In response, the State cites to *State v. Hughes*, 5th Dist. Tuscarawas No. 1433, 1980 WL 354031 (Nov. 28, 1980) ($1 admission charged to enter business place where liquor was distributed), and *State v. Ward*, 9th Dist. Summit No. 12590, 1987 WL 11525 (May 13, 1987) ($6 donation entitled attendees to free beer and pizza). In both of those cases, an admission charge for a location where alcoholic beverages were distributed was found to be sufficient to establish that liquor was being sold in violation R.C. 4301.58.

{¶ 39} We find the circumstances here more closely resemble those in *Hughes* and *Ward* and to be distinguishable from *Bishop*. The marquee in front of the IUE hall advertised free beer and pizza for $15 on July 28, 2012. Detective Oney testified that anyone older than 20 years old was asked to pay $15 to enter and received an orange wristband and cup, that individuals between 11 and 20 years old paid $10 and received a green wristband and no cup, and that individuals younger than 11 years old were free. Both detectives believed they had to pay $15 in order to drink beer. Upon arrival, Oney and George each gave $15 to enter, and they received free pizza and beer inside the hall. Detective George was told the he did not have to wear the wristband, but he had to show it inside to prove that he had paid. The bar area had a sign with suggested "donations" for various liquor drinks, including $2 for Jack Daniel's; Detective George gave Hilgeman a $5 bill and got $3 in return for a shot of that drink. Neither the IUE hall nor Boscarino had a permit to allow liquor sales. Although nominally referred to as donations, the State's

evidence regarding the $15 fee for beer and pizza and the distribution of liquor drinks for a "donation" was sufficient to prove that liquor was sold at the fundraising event, contrary to R.C. 4301.58(B).

{¶ 40}  In his defense, Boscarino provided evidence that some attendees considered the $15 fee to be a donation.   Ryan Jones testified, "I knew it was a fundraiser for Nikkos * * * and they were giving away beer and pizza so fifteen dollars at the door was no problem to me and I was happy to give them the money to help out."   Jones stated that he could have walked in without paying the $15.   Jake Preston stated that he asked where to put his donation, he put a $20 bill in a bucket, and he got a wristband.   On the other hand, other defense witnesses, such as Roger Wells, stated that he understood that $15 was the admission price for beer. Upon considering all of the evidence, the jury could have reasonably concluded that liquor was sold at the fundraiser.   Boscarino's conviction under R.C. 4301.58(B) was not against the manifest weight of the evidence.

{¶ 41}  Finally, Boscarino was convicted of keeping a place where intoxicating liquors are sold in violation of law, in violation of R.C. 4399.09.   That statute provides: "No person shall keep a place where beer or intoxicating liquors are sold, furnished, or given away in violation of law."   The evidence at trial supported the conclusion that Boscarino rented the IUE hall on July 28, 2012, at which time beer and liquor were sold without a permit, in violation of R.C. 4301.58(B).   Boscarino's conviction under R.C. 4399.09 was based on sufficient evidence and was not against the manifest weight of the evidence.

{¶ 42}  Boscarino's first and second assignments of error are overruled.

### III.   Ineffective Assistance of Counsel: Speedy Trial

{¶ 43}   In his third assignment of error, Boscarino's states that he "was deprived of effective assistance of counsel."   Boscarino claims that his trial counsel rendered ineffective assistance when he failed to file a motion to dismiss on speedy trial grounds.

{¶ 44}   We review alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).   Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance.   *Strickland* at 688.   To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his or her errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different.   *Id.*

{¶ 45}   The right to a speedy trial is guaranteed by the United States and Ohio Constitutions.   *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025 (1989).   Ohio's speedy trial statute, R.C. 2945.71, "was implemented to incorporate the constitutional protection of the right to a speedy trial" provided in the United States and Ohio Constitutions.  *Brecksville v. Cook*, 75 Ohio St.3d 53, 55, 661 N.E.2d 706 (1996).   As such, that statute must be strictly construed against the State.   *Id*.

{¶ 46}   A defendant can establish a prima facie case for a speedy trial violation by demonstrating that the trial was held past the time limit set by statute for the crime with which the defendant is charged.   *State v. Gray*, 2d Dist. Montgomery No. 20980, 2007-Ohio-4549, ¶ 15.   "If the defendant can make this showing, the burden shifts to the

State to establish that some exception[s] applied to toll the time and to make the trial timely. If the State does not meet its burden, the defendant must be discharged.   R.C. 2945.73." *Id.*

**{¶ 47}** Boscarino was charged with three first-degree misdemeanors and an unclassified misdemeanor.  A person charged with a first-degree misdemeanor or another misdemeanor for which the penalty is imprisonment for more than 60 days must be brought to trial within 90 days after the person's arrest or service or summons.  R.C. 2945.71(B)(2). The penalty for a violation of R.C. 4399.09, an unclassified misdemeanor, is a fine between $100 and $500 for the first offense and between $200 and $500 on each subsequent offense. R.C. 4399.99(B).   The speedy trial limitation for such an offense is typically 45 days.  R.C. 2945.71(B)(1).   However, when charges of different degrees arise out of the same act or transaction, the defendant "shall be brought to trial on all of the charges within the time period required for the highest degree of offense charged."   R.C. 2945.71(D).   Accordingly, all of Boscarino's charges were subject to a 90-day speedy trial deadline.

**{¶ 48}** When the accused is held in jail in lieu of bail on the pending charge, each day is counted as three days.   R.C.  2945.71(E).   However, Boscarino was released on bond the same day that he was arrested.   Accordingly, the triple-count provision is inapplicable in this case.

**{¶ 49}** The time within which a defendant must be brought to trial may be extended for the reasons specifically enumerated in R.C. 2945.72.  *State v. Brewer*, 2d Dist. Montgomery Nos. 22159, 22160, 2008-Ohio-2715, ¶ 37, citing *State v. Palmer*, 84 Ohio St.3d 103, 702 N.E.2d 72 (1998).  Permissible reasons for extending the trial date include "[a]ny period of delay necessitated by reason of a * * * motion * * * made or instituted by the

accused" and "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion[.]" R.C. 2945.72(E) and (H).

**{¶ 50}**    Boscarino was arrested on July 29, 2012, and the trial was originally scheduled for September 13, 2012.  The trial date was reset by the court, sua sponte, to October 17, 2012, due to (1) an older case that took precedence and went forward with a jury on September 13, and (2) the parties made the court aware that the consolidated cases would require a three-day trial, instead of the two days that are normally required.

**{¶ 51}**    The case was again continued on October 2, 2012, when the trial court granted the State's motion for a continuance because laboratory results were still pending. Boscarino subsequently filed a memorandum opposing the State's motion.  He noted that he did not have an opportunity to respond to the State's motion, and he argued that the basis for the State's motion was unsubstantiated.  Boscarino stated that there was no documentation from the  Miami Valley Regional Crime Lab supporting the State's reason for the continuance, and the discovery received from the State did not include a Crime Lab request form.  Upon reconsideration on October 11, the trial court found the State's request to be reasonable and again granted the continuance.  The trial court rescheduled the trial date for November 8, 2012.

**{¶ 52}**    Boscarino claims that his speedy trial rights were violated when the trial court granted, over his objection, the State's October 2, 2012 motion for a continuance due to a back-up at the laboratory.  The State responds that Boscarino's speedy trial time was extended by several tolling events, including Boscarino's request for discovery, his motion to

consolidate his case with those of his co-defendants, his request for a bill of particulars, the trial court's sua sponte continuance of the September trial date, and the State's request for a continuance due to a delay in obtaining laboratory results.

**{¶ 53}** We agree with the State that Boscarino's speedy trial rights were not violated when he was brought to trial on November 8, 2012. Boscarino filed several motions that tolled the speedy trial time. For example, Boscarino filed a demand for discovery on August 3, 2012, and a motion for a bill of particulars on August 14, 2012. A defendant's demand for discovery or a bill of particulars is a tolling event, pursuant to R.C. 2945.72(E). *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159; *State v. Dankworth*, 172 Ohio App.3d 159, 2007-Ohio-2588, 873 N.E.2d 902, ¶ 45 (2d Dist.). The State did not respond to the bill of particulars until October 12, 2012, and it is unclear when the State responded to the demand for discovery. Even assuming that the State's response to the request for a bill of particulars was unreasonably slow, a two-week tolling of Boscarino's speedy time – the time needed for Boscarino's trial to be timely – would not have been unreasonable.

**{¶ 54}** In addition, prior to the expiration of Boscarino's speedy trial time, the State moved for – and the trial court granted – a continuance of the trial date on the ground that "[t]he Lab is backed up and results are not yet available." We find no fault with the trial court's conclusion that a continuance for purposes of awaiting laboratory results was "reasonable and for good cause," or with a 13-day delay of the trial date (from October 26 to November 8) on that basis. Given this conclusion, we need not address the other alleged bases for tolling the speedy trial time.

**{¶ 55}** In summary, Boscarino's right to a speedy trial was not violated when he was

brought to trial on November 8, 2012. Consequently, his trial counsel did not provide ineffective assistance when counsel failed to move for a dismissal on speedy trial grounds.

**{¶ 56}** Boscarino's third assignment of error is overruled.

### IV. Selective Prosecution

**{¶ 57}** In his fourth assignment of error, Boscarino claims that he was subject to selective prosecution. His complaint appears to be more one of targeted enforcement, rather than constitutionally-prohibited selective prosecution.

**{¶ 58}** In general, the decision whether to prosecute a criminal offense is left to the discretion of the prosecutor. *State v. Turner*, 192 Ohio App.3d 323, 330, 2011-Ohio-393, 949 N.E.2d 57 (2d Dist.), citing *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). The prosecutor's decision is entitled to a "strong presumption of regularity," and a defendant must do more than simply show that others who are similarly situated were not prosecuted. *Id.*, citing *Cleveland v. Trzebuckowski*, 85 Ohio St.3d 524, 533, 709 N.E.2d 1148 (1999). A defendant claiming selective prosecution

> "'bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.'" *State v. Flynt* (1980), 63 Ohio St.2d 132, 134, 17 O.O.3d 81, 407 N.E.2d 15, quoting *United States v. Berrios*

(C.A.2, 1974), 501 F.2d 1207, 1211.

*State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 44.

**{¶ 59}** Boscarino claims that his fundraising event was targeted. The purpose of the July 28, 2012 event was to raise money for Boscarino's son, Nikolaos, who had accumulated legal and medical expenses arising out of an altercation with a police officer at Taggart's bar in Dayton.

**{¶ 60}** Sergeant Lowe testified that he was called by Lieutenant Stivers because Stivers's confidential informant had reported a fundraiser for the Boscarino defense. The primary concern was illegal alcohol sales and gambling. Stivers also told Lowe that there was a court order that a video of Nikolaos's arrest not be shown, so "if it was shown then that would be another violation." The record does not reflect the identity of Stivers's confidential informant, and it is unclear whether there was a filed court order precluding the showing of the arrest video.

**{¶ 61}** The record does not support Boscarino's claim of selective prosecution or targeted enforcement (even assuming the latter is prohibited). Boscarino does not attempt to identify other individuals who held a similar event, with illegal gambling and distribution of alcohol through "donations", but were not prosecuted. Nor is there any evidence that the prosecution was based on any constitutionally impermissible consideration. In addition, the testimony of Oney, George, St. Clair, and Lowe at trial reflects that none of the police officers who conducted the investigation of Boscarino's fundraiser was involved in the events regarding Nikolaos at Taggart's, and none of the officers had a close association with the officer who was allegedly injured by Nikolaos. We can glean nothing from the record that

the decisions to arrest and prosecute Boscarino were acts of intentional and purposeful discrimination.

**{¶ 62}** Boscarino's fourth assignment of error is overruled.

## IV. Sentencing

**{¶ 63}** Boscarino's fifth assignment of error claims that the trial court abused its discretion in sentencing him.

**{¶ 64}** When sentencing for a misdemeanor offense, the trial court is guided by the "overriding purposes of misdemeanor sentencing," which are to protect the public from future crime by the offender and others and to punish the offender. R.C. 2929.21(A); *State v. Collins*, 2d Dist. Greene No. 2012-CA-2, 2012-Ohio-4969, ¶ 9. "To achieve those purposes, the sentencing court [must] consider the impact of the offense upon the victim and the need for changing the offender's behavior, rehabilitating the offender, and making restitution to the victim of the offense, the public, or the victim and the public." R.C. 2929.21(A). The sentence imposed must be "reasonably calculated to achieve the two overriding purposes of misdemeanor sentencing * * *, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar offenses committed by similar offenders." R.C. 2929.21(B); *Collins* at ¶ 9.

**{¶ 65}** "A trial court is also required to consider the nature and circumstances of the offense, whether there was a history of persistent criminal activity or character that reveals a substantial risk of the offender committing another offense, and numerous other factors related to the offender and the offense. R.C. 2929.22(B). However, in misdemeanor

sentencing, there is no requirement that a trial court specifically state its reasons for imposing the sentence that it does on the record. *State v. Jackson*, 2d Dist. Montgomery No. 20819, 2005-Ohio-4521, ¶ 16, citing *State v. Harpster*, 5th Dist. Ashland No. 04COA061, 2005-Ohio-1046." *Collins* at ¶ 10. "If the sentence imposed is within permissible statutory limits, a reviewing court will presume that the trial court considered the sentencing factors in R.C. 2929.22(B), absent a showing to the contrary." *State v. Johnson*, 2d Dist. Greene No. 04-CA-126, 2005-Ohio-6826, ¶ 9.

{¶ 66} We review misdemeanor sentences for an abuse of discretion. *State v. Peagler*, 2d Dist. Montgomery No. 24426, 2012-Ohio-737, ¶ 3.

{¶ 67} Pursuant to R.C. 2929.24(A)(1) and R.C. 2929.28(A)(2)(i), a trial court may impose a sentence of up to 180 days in jail and a fine of up to $1,000 for a misdemeanor of the first degree. R.C. 2929.27(A)(3) allows the court to impose a term of community service of up to 500 hours for a first-degree misdemeanor. The trial court may impose a jail term under R.C. 2929.24, suspend all or a portion of the jail term imposed, and place the offender under a community control sanction or combination of community control sanctions authorized under section 2929.26, 2929.27, or 2929.28 of the Revised Code. R.C. 2929.25(A)(1)(b).

{¶ 68} With respect to the gambling, activities without a permit, and operating a gambling house offenses, the trial court imposed 180 days in jail for each count, all of which were suspended, and one year of non-reporting community control, with a condition that Boscarino complete 500 hours of community service. The trial court did not provide a deadline for completing the community service at sentencing, but its judgment entry states

that the community service must be performed by April 19, 2013.[3] The court imposed $1,000 fines for the three offenses, for a total of $3,000, and court costs, including jury costs. The court imposed a $500 fine for the keeper of place charge. The trial court's sentence represented a suspended maximum jail term, maximum fines, and a maximum term of community service for the first-degree misdemeanors.

{¶ 69} The evidence at trial indicated that the fundraiser was a one-time event to benefit Nikolaos Boscarino and was attended by relatives, friends, and acquaintances of the Boscarinos (with the exception of the undercover officers). There is no evidence that Boscarino engaged in prior criminal activity, and nothing in the record suggests that Boscarino would engage in criminal activity in the future. Boscarino informed the court that he had served 20 years in the United States Air Force and worked as a government contractor for an additional nine years; he held top secret special compartment and information security clearance. Boscarino is recently retired, and his income consists of his military retirement. Boscarino accepted responsibility for his actions, but denied that he knowingly violated the law.

{¶ 70} We cannot conclude that the jail term, which was suspended in its entirety, was unreasonable, nor was the imposition of fines, considering the financial implications of Boscarino's offenses. Boscarino was convicted of three first-degree misdemeanors, and 500 hours of community service is an authorized punishment for those offenses. Boscarino

---

[3] The trial court also did not inform Boscarino at sentencing of the consequences of violating community control. The judgment entry states, however, that a violation of community control may result in a longer time under the same control, a more restrictive community control sanction, and/or a combination of community control sanctions, including up to 180 days in jail.

indicated that he was retired, and he did not raise any concerns at sentencing that 500 hours would be overly burdensome. Accordingly, we also cannot conclude that a 500-hour community service requirement was an abuse of discretion.

**{¶ 71}** Of concern, however, is the trial court's community control sanction that the 500 hours of community service be performed by April 19, 2013. The trial court sentenced Boscarino on January 3, 2013, and in the judgment entry filed on January 7, 2013, required him to complete his 500 hours of community service within 15 weeks of that date (which comes to 33.33 hours per week for 15 weeks, or 12.5 weeks at 40 hours per week).

**{¶ 72}** A defendant has a right to be present at every stage of a criminal proceeding, including sentencing. Ohio Constitution, Article I, Section 10; Crim.R. 43(A); *State v. Walker*, 2d Dist. Clark Nos. 2013 CA 8, 2013 CA 9, 2014-Ohio-526, ¶ 22. The amendment or modification of a defendant's sentence outside of a defendant's presence violates a defendant's right to notice and to due process. *See State v. Haymon*, 5th Dist. 2005 CA 163, 2006-Ohio-3296, ¶ 14, citing *Cleveland v. Clemons*, 90 Ohio App.3d 212, 628 N.E.2d 141 (8th Dist.1993). Thus, "a trial court errs when it issues a judgment entry imposing a sentence that differs from the sentence pronounced in the defendant's presence." *State v. Culver*, 160 Ohio App.3d 172, 2005-Ohio-1359, 826 N.E.2d 367, ¶ 70 (2d Dist.), citing *State v. Aliane*, 10th Dist. Franklin No. 03AP-840, 2004-Ohio-3730, ¶ 8; *see State v. Andrasak*, 194 Ohio App.3d 838, 2011-Ohio-3425, 958 N.E.2d 594 (9th Dist.) (nunc pro tunc entry that modified "no contact" condition of community control violated defendant's rights under Crim.R. 43(A)).

**{¶ 73}** Boscarino was not informed at his sentencing of the condition that he

complete 500 hours of community service by April 19, 2013. The addition of a specific time limitation in the trial court's judgment entry violated Boscarino's right to notice and due process. We therefore conclude that the trial court erred in its imposition of community service as a condition of Boscarino's community control. Accordingly, the community service condition imposed in the judgment entry is reversed, and the matter is remanded for resentencing on this condition.

{¶ 74} Boscarino's fifth assignment of error is overruled in part and sustained in part.

## V. Conclusion

{¶ 75} The portion of the trial court's judgment requiring community service as a condition of community control will be reversed, and the matter will be remanded for resentencing on that condition. In all other respects, the trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Amy B. Musto
Robert Alan Brenner
Hon. Carl Sims Henderson