[Cite as *State v. Ojezua*, 2020-Ohio-303.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28118 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-531/1 |
| | : | |
| RAPHAEL OJEZUA | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 31st day of January, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

KIRIAKOS KORDALIS, Atty. Reg. No. 0089697, 130 West Second Street, Suite 1818, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} After the trial court overruled his motion to suppress, Raphael Ojezua pled no contest in the Montgomery County Court of Common Pleas to possession of heroin, aggravated possession of drugs, and possession of cocaine. The trial court found him guilty, sentenced him to concurrent terms totaling 11 years in prison, and imposed mandatory fines totaling $17,500. Ojezua appeals from his convictions, claiming that the trial court erred in overruling his motion to suppress and imposing the mandatory fines. For the following reasons, the trial court's judgment will be affirmed.

### I. Facts and Procedural History

{¶ 2} The State's evidence at the suppression hearing established the following facts.

{¶ 3} At approximately 8:00 a.m. on October 8, 2015, Ojezua was shot in both legs at a home on Elderberry Avenue in Harrison Township. Nicole Morgan,[1] Ojezua's then-girlfriend who also resided at the home with their young child, called 911.

{¶ 4} Several sheriff's deputies and a detective responded to the shooting dispatch. Deputy Chris Kidwell stated that, while he was on route, he received information that "there were people hiding in their cars with guns." (Supp.Tr. at 18.) He and other officers parked away from the house and walked up looking for individuals with guns in and under cars. While they were looking under the cars, Morgan came outside and told them that her boyfriend had been shot and was inside the house. Kidwell and

---

[1] The record also refers to Morgan as Nicole Jones and Nicole Morgan-Jones. Morgan testified at the suppression hearing that her legal name is Nicole Morgan and that Jones was "a previous married name." (Supp.Tr. at 107.)

other officers entered the house to render aid.

{¶ 5} Morgan told Kidwell that Ojezua was located upstairs. Kidwell found Ojezua in an upstairs bedroom; Ojezua was on the floor, and the deputy saw blood and a towel wrapped around Ojezua's thigh. Ojezua reported that two individuals had entered the home, asked for money, and shot him. Kidwell obtained a description of two suspects and called for a canine to track them. Once it appeared that there were no suspects in the area, the officers called in the medics to treat Ojezua.

{¶ 6} Christopher Caudill, a paramedic/fire fighter with the Harrison Township Fire Department, was among the medical personnel dispatched to the home. He observed that Ojezua had a wound on his right leg that appeared to be from a bullet that had gone through the leg, and another gunshot wound to his left leg. Caudill testified that Ojezua told him that two people had come in and that he was shot there. (Supp.Tr. at 10.) Ojezua was transported to the hospital by ambulance. A deputy accompanied Ojezua to the hospital, but Deputy Kidwell testified that Ojezua was not under arrest and was not handcuffed.

{¶ 7} After Ojezua left by ambulance, Deputy Kidwell asked Morgan for consent to search the house, so that evidence could be searched for and collected regarding the shooting. Kidwell completed a consent to search form and asked Morgan to sign it. Morgan signed the form. According to Kidwell, as soon as Morgan signed it, she asked if she could leave. Kidwell asked that she remain at the house because she could revoke her consent at any time. Morgan immediately responded that she wanted to revoke her consent. As a result, no search was conducted – or even begun -- based on consent. Kidwell estimated that the discussion with Morgan regarding consent occurred at

approximately 8:30 a.m.

{¶ 8} Kidwell told Morgan that they needed to exit the home; the officers left, too, and secured it. Kidwell testified that, when he left the house, he was not aware that drugs were present in the home. Kidwell remained on site, watching the home, while a detective secured a search warrant.

{¶ 9} Detective Eric Dingee of the Special Investigations Unit (violent crimes), the lead investigator, arrived after Morgan revoked her consent to search the home. He spoke with Sgt. Hutchinson, who directed him to get a search warrant. Dingee testified that he needed a search warrant to search the home for evidence regarding the shooting. Kidwell testified that he relayed all of the information that he had obtained from speaking with Morgan and Ojezua to the detective who was getting the warrant.

{¶ 10} The State presented, as Exhibit 1, the search warrant that Dingee sought and obtained on October 8. Exhibit 1 included the affidavit, the warrant, the inventory and receipt, and the return. The affidavit provided the following factual bases for the warrant:

> * * * The Affiant is a sworn police officer with the State of Ohio, and is presently employed with the Montgomery County Sheriff's Office, assigned to the Special Investigations Unit. The Affiant has been a Sworn Peace Officer since 1994, a Deputy Sheriff with Montgomery County Sheriff's Office since 2002, and has been a Detective since 2005. The Affiant has received specialized training in the investigations of violent crimes, sexually oriented crimes, property crimes and narcotics related crimes.

On October 8, 2015, at approximately 0811 hours, deputies were dispatched to [Ojezua's address], reference a person shot. Deputy (Dep.) Christopher Kidwell was the initial responding officer. Upon arrival, Deputy Kidwell contacted Nicole Morgan (DOB: **/**/77), who stated she was taking her son to preschool this morning. Nicole said she walked to her vehicle in the driveway and she was approached by two black males. Nicole said the two black males were armed with handguns and they forced her and her son back into the residence. Nicole said the black males were wearing hoodies, to conceal their facial features. Nicole said the suspect with the green hoodie held a gun on her and her son in the living room. Nicole said the suspect wearing the black hoodie, went upstairs with a gun and confronted her boyfriend, Raphael Ojezua (DOB: **/**/83), who was in their bedroom.

Nicole said she heard the suspect arguing with Raphael and then she heard a gunshot. Nichole said the suspect ran downstairs and both suspects ran out of the residence. Nicole said the suspects ran east on Elderberry Avenue. Nicole said she went upstairs and Raphael was shot in the leg. Nicole said she called 911 and the police arrived. Emergency Medical Technicians arrived on scene and transported Raphael to the hospital. I arrived on scene and contacted Dep. Kidwell, who stated Nicole initially gave written consent to search the residence. Dep. Kidwell said Raphael told Nicole, he did not want the deputies to search the residence. Dep. Kidwell said Nicole denied consent to search the residence at that

time. A records check of the Tiburon system, showed Raphael having previous arrest for possession of drugs. Deputies searched the surrounding area and the suspects were not located.

Dingee testified that he did not present the judge with any information beyond what was contained in the affidavit.

{¶ 11} The judge approved the search warrant at 10:40 a.m. The warrant authorized the search of the residence, curtilage, detached garage, and three vehicles for "[a]ny firearms, casings, ammunition, drugs, cell phones, currency, trace evidence including hair, fibers, fingerprints or blood and any other contraband." (State's Ex. 1.) Upon obtaining the warrant, Dingee returned to the Elderberry residence; to Dingee's knowledge, no search occurred prior to his return.

{¶ 12} A search subsequently was conducted, beginning in the bedroom where Ojezua was shot. Dingee explained that there was blood and clothing there, and he was looking for a bullet and any other evidence involved in the shooting to help identify a suspect. On cross-examination, Dingee testified that he was also looking for drugs, guns, and money in the house, because "100 percent of the home invasions I've investigated involve drugs, money, or guns." (Supp.Tr. at 66.) Dingee testified that additional officers from the Bulk Smuggling Task Force were later involved in the search after officers located drugs and a large sum of money. (Supp.Tr. at 63.)

{¶ 13} The record reflects that $31,000 was located in the top drawer of a dresser in the master bedroom; additional items, including cell phones and mail, were also seized from that bedroom. A digital scale, heroin, a white crystal substance, marijuana, and other items were found in the kitchen. The police also found drugs, currency, and other

items in other rooms of the home.

{¶ 14} At 8:44 a.m., Detective Chris Plummer of the Special Investigations Unit responded to the hospital to speak with Ojezua about the home invasion. Ojezua arrived by ambulance a couple minutes later. Approximately five minutes after Ojezua arrived, Plummer and Ojezua spoke about the shooting. Plummer stated that he did not advise Ojezua of his *Miranda* rights, because Ojezua was a victim. Plummer testified that the conversation was limited to what had happened; Plummer was not conducting a drug investigation, and he did not ask any questions about drugs, money, or guns.

{¶ 15} Agent Richard Miller of the Ohio Attorney General's Office/Bureau of Criminal Investigations became involved with the Elderberry residence as part of the Miami Valley Bulk Smuggling Task Force. Miller stated that he was contacted by the task force commander, who was employed by the Montgomery County Sheriff's Office. The commander told Miller that the Special Investigations Unit was conducting an investigation concerning a shooting at the Elderberry residence and that unit had located a quantity of heroin. The commander asked Miller's unit to assist. Miller said such requests for assistance "happen[ ] all the time." (Supp.Tr. at 87.)

{¶ 16} Miller and three or four other agents responded to the Elderberry address. Miller did not look at the warrant, but he "made sure" that the warrant included authorization to search for narcotics. (*Id.* at 87-88.) Upon searching the residence, officers located paperwork related to a storage unit in Trotwood. Miller called the staff at the storage unit to verify that the unit was up-to-date with payments, and he went to the storage unit. He called for a canine unit to respond to the storage unit to conduct a sniff; the dog alerted on the unit. Miller then applied for and received a search warrant for the

storage unit. (The search warrant for the storage unit was presented as State's Exhibit 2.) Miller contacted officers who were waiting at the storage unit; those officers conducted a search of the unit, finding trace amounts of cocaine.

{¶ 17} On April 27, 2016, Ojezua was indicted for possession of heroin, a first-degree felony, aggravated possession of drugs (methamphetamine), a second-degree felony, and possession of cocaine, a fifth-degree felony. The heroin possession and aggravated possession of drug charges were based on the drugs found at Ojezua's residence; the possession of cocaine charge was based on the drugs found at the storage unit.

{¶ 18} Ojezua subsequently moved to suppress the evidence recovered from his residence, arguing that the search warrant "was not based upon proper Federal and State of Ohio standards," that the police illegally coerced Morgan to consent to the search, and that the police used information from Morgan that was "illegally acquired" to obtain the search warrant for the home. Ojezua further sought to suppress evidence from the storage unit and any statements he made to the police.

{¶ 19} The trial court held a suppression hearing over two days in February 2018. The State called five witnesses, whose testimony is summarized above, and presented three exhibits; Morgan and Ojezua's sister, Mieshutwa Ojezua, testified for the defense.

{¶ 20} Morgan testified that she was leaving her residence at 8:00 a.m. with her three-year-old son when two men "rose from up under Raphael's truck that was in front of my car in the driveway." (Supp.Tr. at 111.) The men walked Morgan back into the house at gunpoint. Morgan stated that Ojezua was asleep on the couch, and one man jumped past her to approach Ojezua. Ojezua woke and jumped off the coach, after

which one of the men pushed him up the stairs. Morgan heard the man and Ojezua arguing upstairs. Morgan heard the man ask Ojezua, "Where is it?" but Morgan generally could not understand the conversation. The second man waited downstairs, talking on his phone. After Morgan heard a gunshot from upstairs, the first man ran down the stairs and both men left. Morgan called 911. She opened the front door and waited for the police to arrive. Morgan testified that when they came, she invited them in and told them where Ojezua was located.

{¶ 21} Morgan agreed that she had consented orally to a search of the home and signed a consent to search form, but she testified that she revoked her consent when a deputy "peeked his head in the front door and said he [presumably, Ojezua] doesn't want the consent."[2] (Supp.Tr. at 122.) Morgan testified that a detective told her that he did not need her consent, because it was a crime scene and he was going to get a warrant. (*Id.* at 122.) Morgan stated that the detective had her and her son leave the house, and the detective and other officers left the house at that time. Morgan was not allowed to take items from the house with her. Morgan contacted her mother using an officer's phone, and her mother picked her up. Morgan returned to her home the following day.

{¶ 22} Ojezua's sister, Mieshutwa, testified that she went to the hospital after hearing from her mother that Ojezua had been shot. She and her mother saw Ojezua in the emergency room. Worried about Morgan, Mieshutwa's mother called Morgan's cell phone number, but an unknown man answered the phone. Mieshutwa estimated that her mother placed the phone call between 9:00 and 9:15 a.m.

---

[2] Morgan's suppression hearing testimony did not clarify who did not "want the consent," but the search warrant affidavit (State's Exhibit 1) averred that Ojezua told Morgan that he (Ojezua) did not want deputies to the search the residence.

{¶ 23} Mieshutwa testified that, at her mother's suggestion, she went to Morgan's house to see if Morgan were there; she estimated that she arrived at 9:30 to 9:40 a.m. Mieshutwa saw Morgan's and Ojezua's vehicles in the driveway, but Morgan was not home. Mieshutwa testified that she saw police officers going in and out of the house, although she was told that they were waiting for a warrant. (The search warrant was signed at 10:40 a.m.) When Mieshutwa saw a group of officers go inside the house, she exited her car and asked if the police had gotten a warrant; an officer told Mieshutwa that they had. In the afternoon, a detective handed Mieshutwa the keys to the house and a receipt for the items that were found.

{¶ 24} On March 16, 2018, the trial court overruled the motion to suppress. The trial court concluded:

The Court finds and holds that the affidavits pertinent to State's Exhibit's [sic] One and Two sufficiently establish probable cause for the neutral Magistrate to issue the search warrants. In addition, the Court holds that the initial entry of the police into the residence by the police was consensual at the invitation of Ms. [Morgan] who was seeking aid for her boyfriend that was shot. Further, there were no facts contained in the affidavit to State's Exhibit One which set forth any observations of any officer of any contraband visualized within the residence. Accordingly, Defendant's suggestion that there was illegally acquired information included in the affidavit is, respectfully, incorrect. Finally, the Defendant made no statements while in custody.

{¶ 25} In July 2018, Ojezua pled no contest to the charged offenses. After a

presentence investigation, the trial court imposed a mandatory term of 11 years in prison for possession of heroin, a mandatory term of 8 years in prison for aggravated possession of drugs, and 12 months in prison for possession of cocaine, to be served concurrently. The court also ordered Ojezua to pay mandatory fines of $10,000 for possession of heroin and of $7,500 for aggravated possession of drugs.

{¶ 26} Ojezua appeals from his convictions, challenging the denial of his motion to suppress and the imposition of fines.

## II. Motion to Suppress

{¶ 27} In his first assignment of error, Ojezua claims that the trial court erred in overruling his motion to suppress, because the search warrant was overbroad and not supported by probable cause.

{¶ 28} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id*.

{¶ 29} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide that search warrants may only be issued upon probable cause, supported by oath or affirmation, particularly describing the place to be

searched, and the person and/or things to be seized. *See also State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, ¶ 11.

**A. Probable Cause**

{¶ 30} In authorizing a search warrant, the issuing magistrate's duty is to determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place * * *." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Jones* at ¶ 13. "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for * * * conclud[ing]' that probable cause existed." *Gates* at 238-239, quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 35. Ordinarily, "a probable cause inquiry must be confined to the four corners of the affidavit." *State v. Klosterman*, 114 Ohio App.3d 327, 333, 683 N.E.2d 100 (2d Dist.1996). In reviewing whether a search warrant has been issued upon probable cause, courts must examine the totality of the circumstances. *Jones,* 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, at ¶ 15.

{¶ 31} Trial courts and appellate courts "should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph two of the syllabus; *Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, at ¶ 14.

{¶ 32} Ojezua claims that the affidavit did not provide probable cause to support a search warrant for drugs and currency. He argues that, with drug cases, "there must exist an <u>evidentiary</u> link between the suspected drug activity and the area before the

probable cause determination may be made." (Emphasis sic.) (App. Brief at 10, citing *State v. Cole*, 2d Dist. Montgomery No. 23058, 2009-Ohio-6131, ¶ 23.)

**{¶ 33}** Here, the affidavit at issue consisted of three paragraphs, the first of which addressed Detective Dingee's (the affiant's) experience in law enforcement. The second and third paragraphs of the affidavit described the shooting, as conveyed by Morgan, and an officer's subsequent discussion with Morgan regarding a consensual search of the home. The only statement in the affidavit regarding drugs stated, "A records check of the Tiburon system, showed Raphael having previous arrest for possession of drugs." (Grammatical errors sic.)

**{¶ 34}** Detective Dingee's search warrant affidavit sufficiently supported a determination that probable cause existed to conduct a search of at least a portion of Ojezua's residence and curtilage for evidence related to the shooting. The affidavit detailed Morgan's description of the arrival of two individuals at the residence, the suspects' behavior in the living room and Ojezua's and Morgan's upstairs bedroom of the residence, and the suspects' fleeing from the residence. The affidavit made clear that Ojezua had been shot in the upstairs master bedroom. We find no fault with the issuance of a search warrant to the extent that it related to the living room and upstairs master bedroom of the residence and the curtilage outside.

**{¶ 35}** However, we agree with Ojezua that the detective's sole reference to Ojezua's "previous" arrest for drug possession was insufficient to demonstrate that there was a fair probability that drugs or contraband would be found in the home. The affidavit did not indicate when Ojezua was previously arrested, nor was there any information to suggest that Ojezua was presently involved in drug possession or drug trafficking, much

less that Ojezua engaged in such conduct at his residence.[3]   Even assuming that Detective Dingee reasonably suspected that Ojezua was engaged in drug activity in his home, as we stated in *State v. Perez,* 2015-Ohio-1753, 32 N.E.3d 1010, ¶ 19 (2d Dist.), "a reasonable belief, without some evidentiary support linking the [place to be searched] to [the defendant's] drug activities, is not enough for a search warrant."

{¶ 36} In addition, nothing in Detective Dingee's affidavit indicated that the suspects visited any portions of the residence other than the living room and upstairs master bedroom.   Morgan had relayed to Kidwell that she was approached by the suspects in the driveway and forced back inside the residence.   The affidavit stated that Morgan was held in the living room (which is entered upon walking through the front door) and that the other suspect confronted Ojezua, who was in his upstairs bedroom.   Morgan related that, after the shooting, the suspects ran out of the house and down the street. Nothing in the affidavit provided a substantial basis for the issuing judge's conclusion that there was a fair probability that evidence related to shooting would be found in other areas of the home, particularly the kitchen on the first floor.

**B. Overbreadth**

{¶ 37} Ojezua further claims that the search warrant was overbroad, because it authorized a search for evidence of a crime, i.e., drugs or currency, "wholly unrelated" to the crime under investigation.   (App. Brief at 10.)   Ojezua emphasizes that the crime at

---

[3] At oral argument, Ojezua's appellate counsel asserted that Detective Dingee's affidavit should have affirmatively stated that Officer Kidwell did not see any drugs, guns, or contraband at Ojezua's residence on the day of the shooting.   Ojezua did not argue in the trial court that the affidavit included an affirmative misstatement or a material omission.   Regardless, under the facts of this case, we disagree that such a statement needed to be included.

issue was a shooting, which the police knew had occurred in a bedroom. Ojezua states, "The police would have been permitted to search that bedroom for evidence of the crime that occurred in that room [but] there is nothing in the warrant to support a search of the home for drugs or contraband." (*Id.* at 11.) Ojezua emphasizes that Detective Dingee's testimony at the suppression hearing that 100 percent of home investigations that he had investigated involved drugs, money, or guns was not included in the affidavit.

{¶ 38} "Courts addressing the particularity requirement of the Fourth Amendment are concerned with two issues. The first issue is whether the warrant provides sufficient information to 'guide and control' the judgment of the executing officers in what to seize. The second issue is whether the category as specified is too broad in that it includes items that should not be seized." (Citations omitted.) *Castagnola,* 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, at ¶ 79; *see also State v. Terrell*, 2017-Ohio-7097, 95 N.E.3d 870, ¶ 66 (2d Dist.).

{¶ 39} Ojezua's argument with respect to the search warrant's authorization to search for drugs and currency is not so much that the warrant lacks sufficient information to guide the officers with respect to drugs and currency or that the terms "drugs" and "currency" are so broad that they include items that should not be seized. Rather, Ojezua's overbreadth argument overlaps with his probable cause argument that the search warrant authorized the search of certain locations and the seizure of certain items (drugs and currency) for which the officers lacked probable cause. *See State v. Kinney*, 83 Ohio St.3d 85, 91-92, 698 N.E.2d 49 (1998) (with respect to a warrant authorizing the search of all persons in a residence, "if the supporting affidavit does not show probable cause to search every person on a premises, an 'all persons' authorization would violate

both the particularity and probable cause requirements of the Warrant Clause."); *Castagnola* at ¶ 70 ("the probable-cause and particularity requirements overlap").

{¶ 40} For the reasons stated above concerning Ojezua's probable cause argument, we further conclude that the search warrant was overbroad to the extent that it authorized the search of Ojezua's entire residence, including drawers and closed containers, for drugs and currency without probable cause.

## C. Good Faith

{¶ 41} The State argues that the exclusionary rule should not be applied here, because the officers relied in good faith on the search warrant in seizing the drugs and currency at issue.

{¶ 42} "The exclusionary rule is a judicially created sanction designed to protect Fourth Amendment rights through its deterrent effect. Under the rule, the state is precluded from using evidence obtained in violation of the Fourth Amendment." (Citation omitted.) *State v. Brown*, 142 Ohio St.3d 92, 2015-Ohio-486, 28 N.E.3d 81, ¶ 12; *see also Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶ 43} Under the good faith exception to the exclusionary rule, the exclusionary rule should not be applied to bar the use of evidence obtained by police officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate, but ultimately found to be unsupported by probable cause. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *State v. Wilmoth*, 22 Ohio St.3d 251, 490 N.E.2d 1236 (1986). "The rationale for the good faith exception to suppression is that the exclusionary rule is designed to deter unlawful police behavior, and the deterrence goal is not advanced when the police objectively and in good faith rely

upon a judge's probable cause determination." *Cole*, 2d Dist. Montgomery No. 23058, 2009-Ohio-6131, at ¶ 30, citing *Leon.*

**{¶ 44}** "[T]he existence of a warrant normally signifies that a law-enforcement officer has acted in good faith." *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 32. However, the good faith exception does not apply where (1) the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth, (2) the issuing magistrate wholly abandoned his judicial role, (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, and (4) the warrant was so facially deficient that the executing officers cannot reasonably presume it to be valid. *Leon* at 923; *Hoffman* at ¶ 32.

**{¶ 45}** There is no evidence that any of the information in Dingee's affidavit was false or misleading, or that the issuing judge abandoned his judicial role in issuing the search warrant. Nor was the warrant so facially deficient that the police officers could not have reasonably presumed it to be valid.

**{¶ 46}** Finally, the affidavit on which the warrant was based was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.

When a warrant has been issued, the legal sufficiency of the underlying affidavit has already been determined by the magistrate, and the magistrate's determination is entitled to credence. Courts cannot make the good faith of an officer turn upon whether his reliance on a warrant was misplaced. It is only when the reliance was wholly unwarranted that good

faith is absent.   *State v. Gray*, 4th Dist. Ross No. 1295, 1986 WL 14457, *6.

*State v. Keefer*, 4th Dist. Hocking No. 19CA2, 2019-Ohio-2419, ¶ 41, motion to certify allowed, 157 Ohio St.3d 1446, 2019-Ohio-4177, 132 N.E.3d 722, ¶ 41.

{¶ 47} In reviewing the officer's conduct, the "inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."   *Leon*, 468 U.S. at 922, 104 S.Ct. 3405, 82 L.Ed.2d 677, fn. 23; *Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, at ¶ 93.   The actions of all officers involved in obtaining and executing the warrant should be considered.   *Herring v. United States*, 555 U.S. 135, 140, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), citing *Leon,* at 923, fn. 24 ("It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination.").   The court's review "does not depend on the subjective knowledge of any individual police officer."   *Castagnola* at ¶ 95, citing *Herring* at 145-146.

{¶ 48} In this case, the search warrant affidavit focused, in large part, on the circumstances of the shooting, and the magistrate had a substantial basis to conclude that evidence related to the shooting would be found in and outside the residence.   Thus, the issuance of a search warrant for the residence and the curtilage, based on the shooting, was supported by probable cause.   Detective Dingee testified that, upon receiving the warrant, he began his search in the master bedroom where Ojezua was shot.

{¶ 49} Although the affidavit contained minimal support for a conclusion that drugs also would likely be found in the residence, we cannot conclude that the officers' reliance on the search warrant at issue merits application of the exclusionary rule. As stated in *Herring*, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring* at 144. We cannot conclude that the error in this case rises to that level.

{¶ 50} Ojezua's first assignment of error is overruled.

### III. Mandatory Fine

{¶ 51} In his second assignment of error, Ojezua claims that the trial court erred in imposing mandatory fines, because the trial court failed to consider his current and future ability to pay, as required by R.C. 2929.18.

{¶ 52} R.C. 2929.18(B)(1) requires a sentencing court to impose a mandatory fine for a first-, second-, or third-degree felony violation of R.C. Chapter 2925 unless (1) the offender files an affidavit of indigency before sentencing, alleging that "the offender is indigent and unable to pay the mandatory fine," and (2) the court "determines the offender is an indigent person and is unable to pay the mandatory fine." R.C. 2929.19(B)(5) also requires that before the court imposes a financial sanction under R.C. 2929.18, it "shall consider the offender's present and future ability to pay the amount of the sanction or fine."

{¶ 53} Offenders who file affidavits alleging that they are indigent and cannot pay

mandatory fines are not automatically entitled to a waiver of their fines.  *State v. Gipson*, 80 Ohio St. 3d 626, 634, 687 N.E.2d 750 (1998); *State v. Ojezua*, 2d Dist. Montgomery No. 27768, 2018-Ohio-3812, ¶ 33.[4]  Defendants have the burden of affirmatively demonstrating that they are indigent and are "*unable to pay* the mandatory fine." (Emphasis sic.)  *Gipson* at 635.

{¶ 54} "The trial court does not need to hold a hearing on the issue of financial sanctions, and there are no express factors that the court must take into consideration or make on the record."  *State v. Culver*, 160 Ohio App.3d 172, 2005-Ohio-1359, 826 N.E.2d 367, ¶ 57 (2d Dist.).  However, the record should contain evidence that the trial court considered the offender's present and future ability to pay before imposing a mandatory fine.  *See Ojezua* at ¶ 33.

{¶ 55} A trial court decision on an offender's ability to pay mandatory fines is reviewed for an abuse of discretion.  *State v. Barker*, 2d Dist. Montgomery No. 26061, 2014-Ohio-3946, ¶ 16.  An abuse of discretion means that the trial court acted unconscionably, arbitrarily, or unreasonably.  *State v. Burns*, 2d Dist. Montgomery No. 22674, 2010-Ohio-2831, ¶ 35.

{¶ 56} Ojezua filed a "financial disclosure form" on August 16, 2018, the date of his sentencing hearing.  The form, which is used to determine whether a defendant is eligible for appointed counsel, indicated that Ojezua resided with his mother, had no assets or expenses, and qualified for Medicaid.  Ojezua further wrote that he had been shot in both legs and has "permanent injury from the shooting."

{¶ 57} According to the presentence investigation report (PSI), which the trial court

---

[4]  *Ojezua* involved a different individual with the same surname as this defendant.

stated it had considered, Ojezua was 35 years old at sentencing; he will be approximately 46 years old upon his release from prison. Ojezua is a high-school graduate and had attended Sinclair Community College for one year studying construction management. Ojezua reported that he was employed from 2015 to 2017 and had done other work in construction and landscaping. He reported being in good physical condition, was not under medical care, and took no prescription medication. He tested negative for illegal drugs, and the PSI reflected that he did not have any apparent issues with alcohol or drug addiction. The offense section of the PSI indicated that the police located $31,562 in the master bedroom during the search of Ojezua's home.

{¶ 58} Ojezua asked the trial court to waive the mandatory fine, and the State objected. The prosecutor emphasized that over $31,000 had been found in Ojezua's sock drawer, and she noted that he had been able to post a significant bond in the case, as well as retain counsel. Defense counsel argued in response that Ojezua's possession of approximately $31,000 at the time of the offense was irrelevant to his then-current financial circumstances and that Ojezua had ongoing physical effects from having been shot in both legs.

{¶ 59} The court concluded that, "despite the information in his affidavit, [Ojezua] is not indigent to the extent of the Court granting him a reprieve from these fines which are mandatory by law * * *." The court cited to Ojezua's age, high school and community college education, and his history of employment. The court noted that Ojezua had supported a request to modify bond with a letter from the owner of the company that had employed him between 2015 and 2017, which stated that the owner would be willing to re-employ Ojezua because he (Ojezua) was a good employee. The trial court further

emphasized that Ojezua had "posted a bond in this case or had someone on his behalf post a bond in the amount of $500,000. Pursuant to *Davenport*, [2017-Ohio-688, 85 N.E.3d 443 (2d Dist.)], this is a permissible consideration for the Court in making this determination on a mandatory fine." The court also recognized that Ojezua had been represented by retained counsel "through the lengthy history of this case." Finally, the court cited Ojezua's admission at Morgan's trial that he was the sole individual who brought drugs into the home and had control over the drugs, as well as that more than $30,000 in cash was located in their home by the police.

{¶ 60} The trial court ordered Ojezua to pay a $10,000 mandatory fine for possession of heroin, a first-degree felony, and a $7,500 mandatory fine for aggravated possession of drugs, a second-degree felony. Both amounts represented half of the maximum possible fine for felonies of the first- and second-degrees, respectively. *See* R.C. 2929.18(B)(1) (requiring the court to impose "at least one-half of, but not more than, the maximum statutory fine amount for the level of the offense").

{¶ 61} Having reviewed the record, we see no abuse of discretion in the trial court's refusal to waive Ojezua's mandatory fines and to impose fines totaling $17,500. At the outset, we note that the filing of the financial disclosure form is the not equivalent of filing an affidavit of indigency which avers an inability to pay the mandatory fine. *See Davenport* at ¶ 35.

> Merely alleging indigency and an inability to afford private counsel does not establish an inability to pay a fine. *See State v. Plemons*, 2d Dist. Montgomery Nos. 26434, 26435, 26436, 26437, 2015-Ohio-2879, ¶ 9. Indeed, "[a] finding of indigence for purposes of appointed counsel does not

shield the defendant from paying a fine." *State v. Lewis*, 2d Dist. Greene No. 2011-CA-75, 2012-Ohio-4858, ¶ 16. " 'This is because the ability to pay a fine over a period of time is not equivalent to the ability to pay legal counsel a retainer fee at the onset of criminal proceedings.' " *Id.*, quoting *State v. Kelly*, 145 Ohio App.3d 277, 284, 762 N.E.2d 479 (12th Dist.2001). As we found in *Plemons*, Davenport's failure to file a pre-sentence affidavit alleging that he is indigent and is unable to pay the mandatory fine is, alone, a sufficient reason to affirm the trial court's decision. *Id.* at ¶ 9. Absent such an affidavit, R.C. 2929.18(B)(1) made the fine mandatory. *Id.*

*Id.*

{¶ 62} Nevertheless, the record reflects that Ojezua resided with his mother and had no expenses. Although his financial disclosure form indicated that he had "permanent injury" to his legs from the shooting, he had reported to the presentence investigator that he was in good physical health. Ojezua had held employment for several years and had a prospect of employment upon his release from prison; Ojezua would be approximately 46 years old at that time. The trial court was entitled to consider that Ojezua was released on a $500,000 bond and had retained counsel throughout his case. The trial court did not abuse its discretion in concluding that Ojezua failed to meet his burden to establish that he did not have the future ability to pay the mandatory fines and in imposing fines totaling $17,500.

{¶ 63} Ojezua's second assignment of error is overruled.

### IV. Conclusion

{¶ 64} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

HALL, J., concurs:

{¶ 65} I concur with affirming the judgment of the trial court.

{¶ 66} I disagree, however, with the conclusion that the trial court should have found the search warrant was overbroad with regard to a search for "drugs, cell phones, currency * * * and any other contraband" in the entire residence. Two men with masks and guns committed abduction of three people during a home invasion that involved shooting Ojezua in the legs. Ojezua had previously been arrested in a drug case. Our cases are legion with recognition of the notion that guns and drugs go together. In addition, one cannot parse out that the entire house was a violent crime scene. This kind of offense does not occur in a vacuum. On first reaction to hearing of this event, an overwhelming part of the general public would infer drugs or money or both were involved. In my opinion it was abundantly reasonable for the issuing magistrate to have issued the warrant, and deference should be accorded.

{¶ 67} I admit the detective's search warrant affidavit would have been stronger had two additional facts been included: one, that the intruders were heard demanding "where is it" before shooting Ojezua, and two, that the detective's experience was that "100 percent of the home invasions [he'd] investigated involve drugs, money, or guns." But even without those additions, I agree with the trial court that the affidavit established probable cause for the search.

Copies sent to:

Mathias H. Heck
Lisa M. Light
Kiriakos Kordalis
Hon. Michael W. Krumholtz